113 F.3d 572
 44 ERC 1577, 65 USLW 2734, 27 Envtl.
L. Rep. 20,949
 UNITED STATES of America, Plaintiff-Appellee,
v.
CORDOVA CHEMICAL COMPANY OF MICHIGAN; Cordova Chemical
Company; Aerojet-General Corporation (92-2288),
Defendants-Appellants,
CPC International Inc. (92-2326), Defendant-Appellant,
Michigan Department of Natural Resources, Defendant-Appellee.
 Nos. 92-2288, 92-2326.
 United States Court of Appeals,
Sixth Circuit.
 Reargued Dec. 6, 1995.
Decided May 13, 1997.
 
 Richard B. Stewart, U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Anne L. Alonzo, U.S. Environmental Protection Agency, Office of Regional Counsel, Region V, Chicago, IL, John Fogarty, Environmental Protection Agency, Enforcement & Compliance Division, J. Carol Williams, U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Michael L. Shiparski, Asst. U.S. Attorney, Thomas J. Gezon, Asst. U.S. Attorney for the Western District of Michigan, Grand Rapids, MI, Michael J. McNulty, U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Katherine W. Hazard (argued and briefed), U.S. Department of Justice, Environment & Natural Resources, Washington, DC, Bradley M. Campbell, U.S. Department of Justice, Washington, DC, Patricia L. Sims, Environmental Protection Agency, Washington, DC, for U.S. in No. 92-2288.
 John V. Byl, Robert J. Jonker (briefed), John D. Tully (argued and briefed), Warner Norcross & Judd, Grand Rapids, MI, for Cordova Chemical Company of Michigan, Cordova Chem. Co., Aerojet-General Corporation in Nos. 92-2288 and 92-2326.
 J. Michael Smith (argued and briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for CPC International Inc. in No. 92-2288.
 Robert P. Reichel, Asst. Attorney Gen. (argued and briefed), Office of the Attorney General, Environmental Protection Division, Lansing, MI, Eric J. Eggan, Office of the Attorney General, Transportation Division, Lansing, MI, Kathleen L. Cavanaugh, Office of the Attorney General, State Affairs Division, Lansing, MI, for Michigan Department of Natural Resources in Nos. 92-2288 and 92-2326.
 Kenneth S. Geller, Donald M. Falk, Mayer, Brown & Platt, Washington, DC, for amicus curiae Business Roundtable in No. 92-2288.
 Paul D. Kamenar (briefed), Washington Legal Foundation, Washington, DC, for amicus Curiae Washington Legal Foundation in No. 92-2288.
 Richard B. Stewart, U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Anne L. Alonzo, U.S. Environmental Protection Agency, Office of Regional Counsel, Region V, Chicago, IL, J. Carol Williams, U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Michael L. Shiparski, Asst. U.S. Attorney, Thomas J. Gezon, Asst. U.S. Attorney for the Western District of Michigan, Grand Rapids, MI, Michael J. McNulty, U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Nicholas Bollo, Wilmette, IL, Katherine W. Hazard (argued and briefed), U.S. Department of Justice, Environment & Natural Resources, Washington, DC, Bradley M. Campbell, U.S. Department of Justice, Washington, DC, Patricia L. Sims, Environmental Protection Agency, Washington, DC, for U.S. in No. 92-2326.
 J. Michael Smith (argued), David M. Buday, Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for CPC International Inc. in No. 92-2326.
 Before: MARTIN, Chief Judge; MERRITT, KENNEDY, MILBURN, NELSON, RYAN, BOGGS, NORRIS, SILER, BATCHELDER, DAUGHTREY, and MOORE, Circuit Judges.
 NORRIS, J., delivered the opinion of the court, in which KENNEDY, MILBURN, NELSON, BOGGS, SILER, and BATCHELDER, JJ., joined and in which MERRITT, J., joined as to Part III.C.3. MERRITT, J. (pp. 583-86), delivered a separate opinion concurring in part and dissenting in part. RYAN, J. (pp. 586-95), delivered a separate dissenting opinion in which MARTIN, C.J., DAUGHTREY, and MOORE, JJ., joined and in which MERRITT, J., joined as to Part I.
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 This appeal highlights the difficulty that often attends the apportionment of liability for the clean-up costs of sites that have been subjected to long-term environmental degradation. In the present case, brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675 (1988 & Supp. V 1993), the environmental damage occurred over a period of decades and during the watch of several owners.
 
 
 2
 A central concern on appeal is the criteria required under CERCLA before a parent corporation can be held financially liable for pollution that occurred on a site owned by a subsidiary. Because we adopt a stricter standard than did the district court for imposition of such liability, we reverse certain of its determinations and remand for further proceedings.
 
 I. PROCEEDINGS BELOW
 
 3
 In May and June 1991, the district court conducted a fifteen-day bench trial to determine which parties were responsible for clean-up costs related to pollution of a site located in Dalton Township, Michigan. In addition to the live testimony of twenty-nine witnesses, the court received more than 2,300 exhibits and reviewed dozens of deposition transcripts. Given the complexity of the proceedings below, the factual findings contained in the district court's published opinion are extensive. CPC Int'l, Inc. v. Aerojet-General Corp., 777 F.Supp. 549, 555-70 (W.D.Mich.1991). We summarize them here by way of background.
 
 
 4
 Beginning in 1957, a series of owners used the Dalton Township site to manufacture chemicals. The initial owner, the Ott Chemical Company ("Ott I"), controlled the site from 1957 until 1965. During this time, the groundwater flowing underneath the site became contaminated, a development confirmed by tests conducted in 1964.
 
 
 5
 Pollution of soil, surface water, and groundwater continued after the Ott Chemical Company ("Ott II"), a wholly owned subsidiary of CPC International, Inc. ("CPC"), took over ownership of the site in 1965. The use of unlined lagoons as a means of chemical waste disposal was the principal cause of the contamination. According to the district court, this practice spanned the period from 1959 until at least 1968.
 
 
 6
 Seepage from these lagoons did not, however, constitute the sole source of pollution that occurred during the ownership of Ott I and Ott II. Further contamination emanated from chemical spills from train cars, from chemical drums, from overflows of chemicals contained in a cement-lined equalization basin, and from other sources. Groundwater pollution did not go completely untreated during this time; from 1965 until 1974, purge wells were operated intermittently in an attempt to alleviate the problem.
 
 
 7
 In 1972, the Story Chemical Company ("Story") acquired the site from Ott II and continued to operate it until 1977, when bankruptcy ended operations. At that point, the trustee in bankruptcy assumed title to the site and attempted to find a buyer.
 
 
 8
 Active governmental response to the pollution problems at the site began in 1977, after Story's bankruptcy, when the Michigan Department of Natural Resources ("MDNR") visited the site to assess the situation. In view of the severity of the environmental problems and the lack of resources to pay for a cleanup, the MDNR became active in an effort to attract a purchaser who would participate financially in clean-up efforts. This search led to the signing of a document on October 13, 1977, by the Cordova Chemical Company ("Cordova/California"), a wholly owned subsidiary of Aerojet-General Corporation ("Aerojet"), and the MDNR. The district court described the agreement and its aftermath:
 
 
 9
 It addressed the problem of environmental contamination at the property and set forth obligations with respect to cleanup activities....
 
 
 10
 ....
 
 
 11
 ... MDNR agreed to remedy the waste container and sludge problems, and Cordova/California agreed to eliminate the phosgene gas and give MDNR $600,000 to defray the costs of the agency's cleanup of the waste containers, sludge and residential wells.
 
 
 12
 ....
 
 
 13
 With respect to Cordova/California's $600,000 payment and the company's responsibility or liability for the contamination at the site it was acquiring, the [agreement] stated:
 
 
 14
 ....
 
 
 15
 Cordova Chemical Company shall not have any responsibility or liability in connection with any other corrective actions which the Department of Natural Resources or any other governmental agency may hereafter deem necessary....
 
 
 16
 ....
 
 
 17
 However, the agreement did not provide for a total cleanup of the site's severe environmental problems....
 
 
 18
 In particular, MDNR and Cordova/California did not reach an agreement regarding a remedy for the groundwater contamination problem. Instead, the fate of the groundwater problems was not resolved, with MDNR left to tackle the problem as part of its overall regulatory responsibility for the site.
 
 
 19
 ....
 
 
 20
 ... Cordova/California and MDNR fulfilled their cleanup obligations under the [agreement].
 
 
 21
 CPC Int'l v. Aerojet-General, 777 F.Supp. at 564-67.
 
 
 22
 Having executed this document, Cordova/California purchased the site the following day from the Story bankruptcy trustee. Cordova Chemical Company of Michigan ("Cordova/Michigan"), a wholly owned subsidiary of Cordova/California, acquired ownership of the site in 1978. Cordova/Michigan retains ownership, although manufacturing operations at the site ceased in 1986.
 
 
 23
 The district court made the following observations regarding conditions at the site during the ownership of the Cordova companies:During their period of operations, [the companies] neither buried waste nor dumped it onto the ground. No chemical waste was disposed into the unlined lagoons that had been used during the Ott I and Ott II eras. Before beginning chemical manufacturing, Cordova/Michigan repaired the equalization basin and chemical sewer system. When operating, Cordova/Michigan discharged chemical waste through off-site disposal or to a sewer that flowed to the Muskegon County treatment facility.
 
 
 24
 Id. at 556. In short, although the preexisting groundwater contamination problem was not remedied during their ownership, the trial court concluded that neither Cordova/California nor Cordova/Michigan exacerbated the condition.[1]
 
 
 25
 The federal Environmental Protection Agency became involved in cleanup of the site in 1981. Since then, the EPA has formulated a long-term response to the environmental damage that has occurred at the site; the cost of this effort will run into the millions of dollars.
 
 II. CERCLA LIABILITY
 
 26
 Section 107(a) of CERCLA lists the parties who are potentially liable for the clean-up costs of a polluted site.[2] 42 U.S.C. § 9607(a). For the purposes of this action, those parties include the present owner and operator of a facility from which there is a release of a hazardous substance, any prior owner or operator of a facility whose involvement coincided with disposal of a hazardous substance, and any person who arranged for the disposal or transport of hazardous waste from a facility. 42 U.S.C. § 9607(a)(1)-(3). The parties stipulated that the site is a "facility" as defined by CERCLA, that it contains "hazardous substances," that "releases" of hazardous substances have occurred and threaten to continue, and that CPC, the MDNR, Aerojet, Cordova/California, and Cordova/Michigan are "persons" as defined by the statute. Id. at 556.
 
 
 27
 Because courts that have been asked to render liability decisions in CERCLA actions frequently invoke the remedial purpose of the act, e.g., United States v. Kayser-Roth Corp., Inc., 910 F.2d 24, 26 (1st Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), we will review that subject before considering the liability of those parties now before us.
 
 
 28
 Congress enacted CERCLA as a "remedial statute designed to protect and preserve public health and the environment." Kayser-Roth, 910 F.2d at 26; accord Schiavone v. Pearce, 79 F.3d 248, 253-54 (2d Cir.1996); Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir.1993); Anspec Co., Inc. v. Johnson Controls, Inc., 922 F.2d 1240, 1241-42 (6th Cir.1991) (reviewing this circuit's approach to CERCLA liability). Accordingly, courts generally will not interpret § 9607(a) in a way that apparently frustrates the statute's goals in the absence of specific congressional intent to the contrary. Anspec, 922 F.2d at 1247 (citing New York v. Shore Realty Corp., 759 F.2d 1032, 1045 (2d Cir.1985)).
 
 
 29
 It must be recognized, however, that it is difficult to divine the specific, as opposed to the general, goals of Congress with respect to CERCLA liability since the statute represents an eleventh hour compromise. See generally Shore Realty Corp., 759 F.2d at 1039-42 (discussing legislative history). As the district court recognized, "some of CERCLA's provisions are vague and its legislative history sparse." CPC Int'l v. Aerojet-General, 777 F.Supp. at 571; accord Anspec, 922 F.2d at 1247 (characterizing the legislative history as "scant"); Lansford-Coaldale Joint Water Auth., 4 F.3d at 1221 ("[C]ongressional intent may be particularly difficult to discern with precision in CERCLA, a statute notorious for its lack of clarity and poor draftsmanship.").
 
 
 30
 Courts would not be warranted, therefore, in pointing to the "remedial legislation" litany, see generally Norman J. Singer, 3 Southerland Statutory Construction § 60.01 (5th ed.1992) (the rule that remedial statutes should be liberally construed is "firmly established"); Dennis v. Higgins, 498 U.S. 439, 443, 111 S.Ct. 865, 868, 112 L.Ed.2d 969 (1991) (noting that 42 U.S.C. § 1983, as a remedial statute, should be liberally construed), as a reason for filling in the blanks left by this sketchy legislative history to impose liability under nearly every conceivable scenario. Thus, while the liability provisions concerning facility operators should be construed so that financial responsibility for clean-up operations falls upon those entities that contributed to the environmental problem, the widest net possible ought not be cast in order to snare those who are either innocently or tangentially tied to the facility at issue. In fact, this court has pointed out that, "Congress intended that those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created." Anspec, 922 F.2d at 1247 (emphasis added).
 
 
 31
 In turning to the specific facts now before us, we adhere to the tenet that liability attaches only to those parties who are culpable in the sense that they, by some realistic measure, helped to create the harmful conditions.
 
 
 32
 In its effort to discern the sweep of CERCLA liability, the district court concluded that:
 
 
 33
 CERCLA broadens the potential for liability of parent corporations without discarding entirely the traditional concept of limited liability that is central to corporate law....
 
 
 34
 Accordingly, it seems that CERCLA's "owned or operated" language forges a new, middle ground. It is a ground that at once accommodates the general principle of limited liability and the broader principle of liability attaching for operative activity. To permit these principles to coexist under CERCLA, the liability of a parent corporation cannot attach simply because a parent has had involvement with its subsidiary in a manner merely consistent with their investment relationship. Rather, a parent must have actually operated the business of its subsidiary.
 
 
 35
 In this court's view, then, a parent corporation is directly liable under section 107(a)(2) as an operator only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates "operator" liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not.
 
 
 36
 CPC Int'l v. Aerojet-General, 777 F.Supp. at 573 (emphasis added).
 
 
 37
 On the basis of this "new, middle ground," the district court found both CPC and Aerojet liable as operators for the disposal of hazardous substances that occurred while their subsidiaries operated the site.
 
 III. DISCUSSION
 A. CPC
 
 38
 The district court reasoned that liability potentially could attach to CPC as a parent corporation in two ways: direct liability under CERCLA's "operator" language or by common law veil-piercing. Clearly, since the facility was titled in the subsidiary's name, CPC could be found liable as an owner only through veil piercing. The court determined that CPC was liable as an operator of the site for environmental damage that occurred during the ownership of Ott II; this liability was grounded in section 107(a)(2) of CERCLA, which renders "any person [liable] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). To reach this conclusion, the court necessarily had to hold CPC, as a parent corporation, accountable for the environmental conduct of its wholly owned subsidiary corporation, Ott II. And, because the court held CPC directly liable as an operator, it did not reach the question of whether CPC was liable as an owner pursuant to the traditional common law doctrine of veil-piercing.
 
 
 39
 It is not at all clear from the district court's opinion whether the basis for finding parental liability as an operator under its "new, middle ground" is the actual operation of the subsidiary's business or, on the other hand, the exertion of power or influence through active participation in the subsidiary's business. Although they are used interchangeably in the district court's opinion, the two concepts are not interchangeable. If anything, the facts recited by the district court support liability under the latter standard but not under the former. This confusion underscores the inevitable difficulty that arises when courts attempt to erect new concepts of corporate liability within the framework of CERCLA in the absence of direction from Congress. We are not persuaded that, in enacting CERCLA, Congress contemplated the abandonment of traditional concepts of limited liability associated with the corporate form in favor of an undefined "new, middle ground."
 
 
 40
 Actually, another scenario occurs to us under which one could argue that a parent corporation should be deemed to have directly operated a facility owned by its subsidiary. At least conceivably, a parent might independently operate the facility in the stead of its subsidiary; or, as a sort of joint venturer, actually operate the facility alongside its subsidiary. However, this is not a theory of operator liability relied upon by the district court, or alluded to in its opinion.
 
 
 41
 CERCLA defines the "owner or operator" of an onshore facility as "any person owning or operating such facility." 42 U.S.C. § 9601(20)(A)(ii). When the facility has been conveyed to a unit of state or local government, the definition differs. It then includes "any person who owned, operated or otherwise controlled activities at such facility immediately [before the transfer to the governmental authority]." 42 U.S.C. § 9601(20)(A)(iii). It thus appears that the drafters of the statute distinguished an operator from a person who "otherwise controlled" a facility. When the owner of a facility contracts out the daily running of the operation to a third party, that party presumably attains operator status (and its attendant liability). However, when a parent corporation actively participates in the affairs of its subsidiary consistent with the restrictions imposed by traditional corporations law, nothing in the definition just cited or in the rest of the statute indicates that the parent has assumed the role of operator.
 
 
 42
 Despite the definition of "owner or operator," several circuits, like the district court below, have determined that parent corporations can attain operator status by exerting significant control over the operations of their subsidiaries. See, e.g., Kayser-Roth, 910 F.2d at 26-27; Schiavone, 79 F.3d at 255; Lansford-Coaldale Joint Water Auth., 4 F.3d at 1221; Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 842 (4th Cir.), cert. denied, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); CPC Int'l v. Aerojet-General, 777 F.Supp. at 572-73.
 
 
 43
 While some may wish to extend the reach of CERCLA to maximize the impact of its remedies, nothing in the statute or its legislative history warrants the invocation by courts of vague, expansive concepts, such as the district court's "new, middle ground," which threaten the efficacy of time-honored limited liability protections afforded by the corporate form. As the Court of Appeals for the Fifth Circuit has noted in this context, "[i]f Congress wanted to extend liability to parent corporations it could have done so, and it remains free to do so." Joslyn Mfg. Co. v. T.L. James & Co., Inc., 893 F.2d 80, 83 (5th Cir.1990).
 
 
 44
 The district court's approach presents a number of problems. First, it replaces the relatively bright line provided by the traditional doctrine of piercing the corporate veil with a nebulous "control" test. When, precisely, is a parent acting in a manner consistent with its investment relationship as opposed to a manner that triggers operator liability? The indicia enumerated by the district court, such as participation in the subsidiary's board of directors and involvement in specific policy decisions, offer little guidance. Certainly, these activities are not grounds traditionally relied upon as warranting the disregard of separate corporate existences.
 
 
 45
 Second, the threat of unlimited liability will likely deter private sector participation in the cleanup of existing sites. The case before us illustrates this point. There is no dispute that the MDNR actively sought a private sector partner to take over and assist in the remediation of the site. Aerojet indicated an interest on the condition that it could cap its potential liability for environmental cleanup, which it sought to accomplish through the negotiation of the agreement with the MDNR and the use of subsidiaries.[3] To scuttle such sensible and legitimate precautions in favor of an unpredictable "control" test would actually contravene the public interest by discouraging businesses from being involved in such projects.
 
 
 46
 Accordingly, we reject the district court's "new, middle ground" as the basis for fixing operator liability and hold that where a parent corporation is sought to be held liable as an operator pursuant to 42 U.S.C. § 9607(a)(2) based upon the extent of its control of its subsidiary which owns the facility, the parent will be liable only when the requirements necessary to pierce the corporate veil are met. In other words, under the circumstances of this case, whether the parent will be liable as an operator depends upon whether the degree to which it controls its subsidiary and the extent and manner of its involvement with the facility, amount to the abuse of the corporate form that will warrant piercing the corporate veil and disregarding the separate corporate entities of the parent and subsidiary.
 
 
 47
 Whether the circumstances in this case warrant a piercing of the corporate veil will be determined by state law. See Anspec, 922 F.2d at 1248. Michigan appears to follow the general rule that requires demonstration of patent abuse of the corporate form in order to pierce the corporate veil. There must be such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist, and the circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.30 (perm. ed. rev.vol.1990); Stephen H. Schulman et al., Michigan Corporation Law & Practice § 3.9(c) (1991 Supp.); Seasword v. Hilti, Inc., 449 Mich. 542, 548, 537 N.W.2d 221, 224 (1995) (corporate veil may be pierced where the subsidiary is a "mere instrumentality" of the parent and the separate corporate existence is used to subvert justice or cause result contrary to clearly overriding public policy); see also Bodenhamer Bldg. Corp. v. Architectural Research Corp., 873 F.2d 109, 111-12 (6th Cir.1989) (surveying Michigan corporate veil-piercing decisions). Organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud or reprehensible conduct justifying a disregard of the corporate form. Gledhill v. Fisher & Co., 272 Mich. 353, 359, 262 N.W. 371, 373 (Mich.1935).[4]
 
 
 48
 The district court relied upon a number of factors in determining that CPC "actively participated in and exerted significant control over Ott II's business and decision-making" and was therefore directly liable under 42 U.S.C. § 9607(a)(2) as an operator: 100% ownership of Ott II; participation on Ott II's board of directors; a cross-pollination of officers who were involved in decision-making and daily operations; active participation by CPC officials in environmental matters; and financial control of Ott II through approval of budgets and capital expenditures. CPC Int'l v. Aerojet-General, 777 F.Supp. at 575. While these factors reveal a parent that took an active interest in the affairs of its subsidiary, they do not indicate such a degree of control that the separate personalities of the two corporations ceased to exist and that CPC utilized the corporate form to perpetrate the kind of fraud or other culpable conduct required before a court can pierce the veil. While CERCLA contemplates allocating financial responsibility to those corporations that cause environmental degradation, it does not authorize assignment of liability to parent corporations that abide by the proper use of the corporate form.
 
 
 49
 In summary, then, it seems to us that under the "owned or operated" language of 42 U.S.C. § 9607(a)(2), there are three scenarios under which a parent corporation could be held liable for the disposal of hazardous substances at a facility whose owner of record was the parent's subsidiary corporation. First, as an owner, by piercing the corporate veil. Second, as an operator, where the parent directly operates the facility itself, either independently of its subsidiary, or as an actual co-operator alongside the subsidiary.[5] Although a parent conceivably could be held liable under this theory, it is not the one relied upon by the district court, and, in any event, is not supported by the facts in the record before us.
 
 
 50
 Finally, operator liability may be based upon the conduct of the parent in the course of its affiliation with its subsidiary, including the degree of control exerted by the parent over its subsidiary. This is the scenario utilized by the district court, relying upon its "new, middle ground" standard to define the circumstances under which the parent will be liable. As pointed out above, we conclude that this "new, middle ground" is unworkable, and that traditional veil piercing is the only standard under which this scenario for liability can be assessed reliably.
 
 
 51
 Accordingly, the district court's finding of operator liability with respect to CPC must be reversed.
 
 B. MDNR Liability
 
 52
 The district court rejected liability claims that were advanced against the MDNR on two fronts: as an operator and as an "arranger." Only the district court's decision regarding arranger liability is appealed.
 
 CERCLA imposes liability on
 
 53
 any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances.
 
 
 54
 42 U.S.C. § 9607(a)(3).
 
 
 55
 It is contended that the MDNR incurred arranger liability when it negotiated with Cordova/California for the acquisition of the site and agreed with Cordova/California on a plan to clean up the groundwater contamination.
 
 
 56
 We agree with the district court's conclusion that the MDNR escapes liability because its actions were taken in response to the Act's environmental emergency provision:
 
 
 57
 No state or local government shall be liable under this subchapter for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.
 
 
 58
 42 U.S.C. § 9607(d)(2). Our reading of the record indicates that the MDNR acted in good faith when attempting to address the groundwater contamination of the site. That its efforts proved to be less than entirely successful is unfortunate, but does not subject the agency to liability.[6]
 
 
 59
 C. Liability of Aerojet and its Subsidiaries
 
 1. Owner Liability
 
 60
 The district court held both Aerojet and Cordova/Michigan liable as present owners of the site under CERCLA'S section 107(a)(1) which assigns liability to "the owner and operator of a ... facility." 42 U.S.C. § 9607(a)(1). Cordova/Michigan does not challenge this decision on appeal and we therefore express no opinion with respect to its liability.
 
 
 61
 As for the parent corporation, Aerojet could be found liable as an owner only through veil piercing, since Cordova/Michigan was the owner of record. The district court appropriately looked to Michigan law to determine whether to pierce the corporate veil and, in its view, the evidence supported a conclusion that Aerojet had "totally dominated Cordova/Michigan, creating a complete identity of interests between the parent and its wholly owned subsidiary." CPC Int'l v. Aerojet-General, 777 F.Supp. at 578. Accordingly, the court determined that it was appropriate to pierce the corporate veil. Among the grounds cited for its decision, the court highlighted the total ownership by the parent, Aerojet's active participation in the acquisition of the site, the timing of the incorporation of the subsidiaries, cross-pollination of corporate officers, financial control, and the integration of the businesses. Id. at 577.
 
 
 62
 These facts, however, fall somewhat short of what is required to pierce the corporate veil under Michigan law. They do not establish that Cordova/Michigan was a mere instrumentality of Aerojet in the sense that the separate corporate personalities of the parent and subsidiary ceased to exist. More tellingly, they do not reveal activity by Aerojet that approaches the level of culpable conduct contemplated by Michigan law as a predicate to disregarding the separate corporate form. Bodenhamer Bldg. Corp., 873 F.2d at 112. While Aerojet obviously sought to limit its liability for existing environmental problems through good faith negotiation with the MDNR and prudent use of the corporate form, there is nothing to suggest that the company acted to subvert justice or with fraudulent intent or otherwise sought to distort the legitimate purposes of the corporate form. Although Aerojet took an active interest in its subsidiaries, the record does not support a conclusion that Cordova/Michigan was not a viable corporate entity. Accordingly, the district court erred when it pierced the corporate veil to assign liability to Aerojet as an owner.
 
 
 63
 The district court also noted that Cordova/California actually owned the site from October 1977 until November 1978. Although the company began clean-up operations as required by its agreement with the MDNR, the district court found that additional releases of hazardous substances occurred during this period. CPC Int'l v. Aerojet-General, 777 F.Supp. at 579. It thus imposed liability on Cordova/California as a former owner pursuant to section 107(a)(2).
 
 
 64
 This conclusion, however, conflicts with the district court's summary of activity at the site during the ownership of the Cordova companies. Id. at 556. On remand, therefore, we ask the district court to indicate with greater specificity precisely which portions of the record it relies upon to support a finding that additional releases of hazardous substances occurred during Cordova/California's brief ownership. Absent such evidence, liability cannot attach to Cordova/California as a former owner of the site.
 
 2. Operator Liability
 
 65
 Finally, we turn to the district court's alternative imposition of liability on Aerojet pursuant to section 107(a)(2), precisely the same basis for liability that we have already discussed, and rejected, with respect to CPC. Since we decline to adopt the "new, middle ground" control test utilized by the district court, no liability attaches unless the corporate veil can be pierced. And because the record does not support veil piercing, Aerojet cannot be held liable as an operator pursuant to section 107(a)(2).
 
 3. Defenses
 
 66
 Upon remand, the district court should also revisit its treatment of the defense raised by Aerojet, Cordova/California, and Cordova/Michigan under section 107(b)(3). The pertinent part of the statute follows:
 
 
 67
 [A] person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--
 
 
 68
 ....
 
 
 69
 (3) an act or omission of a third party other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, ... and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions....
 
 
 70
 42 U.S.C. § 9607(b) (emphasis added).
 
 
 71
 In parsing the exceptions to the defense, the district court noted that under 42 U.S.C. § 9601(35)(A), the term "contractual relationship" includes deeds transferring title. Thus, the district court concluded that a defense would be unavailable to a defendant who had a direct or indirect contractual relationship with the parties responsible for contaminating the site. CPC Int'l v. Aerojet-General, 777 F.Supp. at 581. Under this view, the defense could not be invoked by any defendant who was a party to a deed with a polluter. The district court, however, ignored the requirement that, in order to render the defense inapplicable, the hazardous substance release must have resulted from the act of a third party "in connection with" the contractual relationship with the defendant. The "in connection with" language of the defense appears to have been designed to preclude a person from escaping liability by contracting for a third party to do his dirty work for him.
 
 
 72
 As we pointed out above, from what we glean from the district court's recitation of facts, the release of hazardous substances appears to have been caused solely by the predecessors of these three defendants.
 
 IV. CONCLUSION
 
 73
 For the foregoing reasons, the district court is reversed in part and affirmed in part and this cause is remanded to the district court for further proceedings consistent with this opinion.
 
 
 74
 MERRITT, Circuit Judge, concurring in part and dissenting in part.
 
 
 75
 I concur in part I of Judge Ryan's opinion, which would hold CPC International directly liable as an operator. I also concur in part III.C.3. of Judge Norris' opinion for the Court and support remanding the case for further findings regarding the Aerojet defendants' assertion of the "third-party" defense, CERCLA § 107(b)(3), 42 U.S.C. § 9607(b)(3), and for further findings regarding whether or not disposal of hazardous substances occurred while the Aerojet defendants owned the site. Unlike Judges Ryan and Norris, however, I believe that federal common law governs the question of whether Cordova/California and Aerojet are liable as current owners pursuant to CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1), rather than Michigan's doctrine of piercing the corporate veil. Since the district court improperly analyzed this question using Michigan state law, I would remand the case for further findings.
 
 I. State Law v. Federal Common Law
 
 76
 Several of the parties argue that Cordova/Michigan, the nominal owner of the site, is an alter ego of Cordova/California and Aerojet and that Cordova/California and Aerojet should thus be held liable as owners under the doctrine of piercing the corporate veil. Resolution of this issue first requires deciding whether the question is governed by state law or federal common law.
 
 
 77
 It is well-established that actions arising under nationwide federal programs are governed by federal law. United States v. Kimbell Foods, Inc., 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). But federal law can incorporate applicable state law doctrines in appropriate circumstances. Id. at 727-28, 99 S.Ct. at 1457-59. In Kimbell Foods, the Supreme Court enumerated the factors a court must consider in deciding whether to apply state law or federal common law. "[F]ederal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules," id. at 728, 99 S.Ct. at 1458 (quoting United States v. Yazell, 382 U.S. 341, 354, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966)), but courts must also consider "whether application of state law would frustrate specific objectives of the federal programs" and "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." Id.
 
 
 78
 Under the Kimbell Foods test, federal common law standards for piercing the corporate veil should be applied in CERCLA actions against parent corporations. All three of the Kimbell Foods factors support using a uniform federal standard.
 
 
 79
 In attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide problem. One can hardly imagine a federal program more demanding of national uniformity than environmental protection. Congress did not intend that the ability of the executive to fund the clean up of hazardous waste sites should depend on the attitudes of the several states toward parent-subsidiary liability in general, or CERCLA in particular. The need for a uniform federal rule is especially great for questions of piercing the corporate veil, since liability under the statute must not depend on the particular state in which a defendant happens to reside.
 
 
 80
 In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 675 F.Supp. 22, 31 (D.Mass.1987).
 
 
 81
 Congress intended for CERCLA to cast a wide net of responsibility for the costs of environmental cleanup. Uniform national standards of liability are necessary to effectuate this goal. Following state law in this area would allow corporations to easily evade their environmental responsibilities under CERCLA by incorporating subsidiaries in states with stringent standards for piercing the corporate veil. See 126 Cong. Rec. H11787 (daily ed. Dec. 3, 1980) (statement of Rep. Florio, CERCLA House sponsor) ("[t]o insure the development of a uniform rule of law, and to discourage business dealings in hazardous substances from locating primarily in States with more lenient laws, the bill will encourage the further development of a Federal common law in this area"). In addition, states' interests in regulating corporations are strongest with respect to internal affairs of the corporation, and are less compelling with respect to external affairs such as shareholder liability to outside parties. See Henry Hansmann & Reinier Kraakman, A Procedural Focus on Unlimited Shareholder Liability, 106 Harv. L.Rev. 446, 450-53 (1992) (arguing that choice of law concerns do not bar unlimited shareholder liability in tort actions); Note, Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L.Rev. 853, 862-63 (1982) (arguing that piercing the corporate veil relates to external affairs and should be governed by the law of the forum); cf. First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983) ("As a general matter, the law of the [country] of incorporation normally determines issues relating to the internal affairs of a corporation.... Different conflicts principles apply, however, where the rights of third parties external to the corporation are at issue." (citations omitted)).
 
 
 82
 Federal precedents support using a federal common law standard for piercing the corporate veil to determine parent corporation CERCLA liability. Although few circuit courts have considered the issue, compare Lansford-Coaldale Joint Water Authority v. Tonolli Corp., 4 F.3d 1209, 1225 (3d Cir.1993) (applying federal common law) with Joslyn Manufacturing Co. v. T.L. James & Co., 893 F.2d 80 (5th Cir.1990) (affirming a district court opinion that declined to address the choice of law question on the grounds that the standard for piercing the corporate veil are the same under state and federal law), district courts have overwhelmingly applied federal common law in this context. Idylwoods Assocs. v. Mader Capital, Inc., 915 F.Supp. 1290, 1305 (W.D.N.Y.1996); Atlantic Richfield Company v. Blosenski, 847 F.Supp. 1261, 1278 (E.D.Pa.1994); City of New York v. Exxon Corp., 112 B.R. 540, 552 (S.D.N.Y.1990), aff'd on other grounds, 932 F.2d 1020 (2d Cir.1991); United States v. Kayser-Roth Corp., 724 F.Supp. 15, 20 (D.R.I.1989), aff'd on other grounds, 910 F.2d 24 (1st Cir.1990); United States v. Nicolet, Inc., 712 F.Supp. 1193, 1201 (E.D.Pa.1989); In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 675 F.Supp. 22, 30-31 (D.Mass.1987); cf. Jacksonville Elec. Auth. v. Eppinger and Russell Co., 776 F.Supp. 1542, 1545-46 (M.D.Fla.1991) (applying Fifth Circuit standard without discussing the choice of law question), aff'd on other grounds sub nom Jacksonville Elec. Auth. v. Bernuth Corp., 996 F.2d 1107 (11th Cir.1993); United States v. Mottolo, 695 F.Supp. 615, 624 (D.N.H.1988) (holding parent corporation liable without piercing the corporate veil because "CERCLA places no importance on the corporate form").
 
 
 83
 Additional support for using a federal common law standard comes from cases involving successor corporation liability under CERCLA. Although this Court has previously relied on state law in that context, see Anspec Co. v. Johnson Controls, Inc., 922 F.2d 1240 (6th Cir.1991), other circuits that have considered this issue have applied federal common law. See B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir.1996); United States v. Carolina Transformer Co., 978 F.2d 832 (4th Cir.1992); Louisiana-Pacific Corp. v. Asarco, Inc., 909 F.2d 1260 (9th Cir.1990); Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86 (3d Cir.1988); see also United States v. Mexico Feed and Seed Co., 980 F.2d 478, 487 n. 9 (8th Cir.1992) (stating in dicta that federal common law should probably be applied).[1]
 
 II. The Proper Federal Standard
 
 84
 Piercing the corporate veil is an equitable doctrine. "The federal common law in this area emerges from the general principle that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.' " In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 675 F.Supp. 22, 33 (D.Mass.1987) (quoting Town of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir.1981)); see also American Bell Inc. v. Federation of Tel. Workers, 736 F.2d 879, 886 (3d Cir.1984) ("the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime"). Two elements are generally regarded to be essential to pierce the corporate veil: "First, the dominant corporation must have controlled the subservient corporation, and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control." Krivo Indus. Supply Co. v. National Distillers & Chem. Corp., 483 F.2d 1098, 1103 (5th Cir.1973).
 
 
 85
 Although some cases require a showing of fraud, see, e.g., Edwards Co. v. Monogram Indus., 730 F.2d 977, 980-81 (5th Cir.1984), even jurisdictions that require such a showing in some circumstances often recognize that fraud is not always required. See, e.g., United States v. Jon-T Chems., Inc., 768 F.2d 686, 692-93 (5th Cir.1985) (finding that fraud is not required to pierce the veil in tort cases even though fraud is required in contract cases). Courts applying federal common law have found that fraud is not required to pierce the corporate veil. See, e.g., Valley Fin., Inc. v. United States, 629 F.2d 162, 172 (D.C.Cir.1980). Requiring a showing of fraud would be particularly inappropriate in CERCLA cases. The fraud requirement appears to arise from the equitable nature of the piercing doctrine. The public policy considerations underlying CERCLA, however, provide a sufficient equitable basis for piercing the corporate veil whether or not fraud has been shown. This conclusion is further supported by CERCLA's limited deference to corporate form. See United States v. Mottolo, 695 F.Supp. 615, 624 (D.N.H.1988); United States v. Kayser-Roth Corp., 724 F.Supp. 15, 23-24 (D.R.I.1989), aff'd on other grounds, 910 F.2d 24 (1st Cir.1990).
 
 
 86
 Similarly, the proximate cause element should not be required in CERCLA cases, because Congress has provided statutory liability criteria. If a CERCLA defendant is a potentially responsible party under CERCLA § 107, 42 U.S.C. § 9607, then no further finding of proximate causation should be required.
 
 
 87
 The test for piercing the corporate veil under federal common law in CERCLA cases thus should be simply whether the parent corporation "controls or at the relevant time controlled the management and operations of the subsidiary." United States v. Nicolet, Inc., 712 F.Supp. 1193, 1202 (E.D.Pa.1989). Federal courts applying this standard in CERCLA cases have relied on one of two tests: a twelve-factor test set out in United States v. Jon-T Chems., Inc., 768 F.2d 686, 691-92 (5th Cir.1985); see Jacksonville Elec. Auth. v. Eppinger and Russell Co., 776 F.Supp. 1542, 1545 (M.D.Fla.1991), aff'd on other grounds sub nom Jacksonville Elec. Auth. v. Bernuth Corp., 996 F.2d 1107 (11th Cir.1993); Joslyn Corp. v. T.L. James & Co., 696 F.Supp. 222, 227 (W.D.La.1988), aff'd, 893 F.2d 80 (5th Cir.1990); or a seven-factor test set out in In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 675 F.Supp. 22, 33 (D.Mass.1987); see Idylwoods Assocs. v. Mader Capital, Inc., 915 F.Supp. 1290, 1305 (W.D.N.Y.1996); City of New York v. Exxon Corp., 112 B.R. 540, 553 (S.D.N.Y.1990), aff'd on other grounds, 932 F.2d 1020 (2d Cir.1991); United States v. Kayser-Roth Corp., 724 F.Supp. 15, 20 (D.R.I.1989), aff'd on other grounds, 910 F.2d 24 (1st Cir.1990). These tests overlap, and neither list of factors is exhaustive. Piercing the corporate veil requires a fact-specific inquiry taking into account all of these factors and any other pertinent circumstances. The trier of fact must consider the totality of the circumstances to determine whether the parent controls or controlled the management and operations of the subsidiary.
 
 
 88
 Because the district court applied Michigan law rather than the proper federal common law standard for piercing the corporate veil, I would remand the case for further review under the proper standard.
 
 
 89
 RYAN, Circuit Judge, dissenting.
 
 
 90
 My colleagues' opinion today reaches three important and dispositive conclusions:
 
 
 91
 That a parent corporation cannot, as a matter of law, be held directly liable under 42 U.S.C. § 9607(a)(2) as an "operator" of a facility owned by its subsidiary corporation, but may face only vicarious liability under state-law corporation-veil-piercing principles;
 
 
 92
 That piercing the corporate veil under Michigan law requires circumstances showing that the corporate form was used to "subvert justice"; and
 
 
 93
 That the district court erred in finding that the defendants failed to prove their entitlement to the so-called third-party defense under 42 U.S.C. § 9607(b)(3).
 
 
 94
 In my judgment, the court is mistaken on all three grounds, and I therefore respectfully dissent.
 
 I.
 
 95
 Direct Liability of a CPC Under Section 107(a)(2)
 
 A.
 
 96
 Parent Corporations as "Operators"
 
 
 97
 CERCLA identifies two distinct categories of individuals or entities that may be held directly liable, as responsible parties, for the costs of cleanup of an environmentally contaminated facility:
 
 
 98
 (1) the owner and operator of a vessel or a facility, [or]
 
 
 99
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]
 
 
 100
 42 U.S.C. § 9607(a) (emphasis added). The parties have stipulated that the site is a "facility" as defined by CERCLA, and that the site contains "hazardous substances."
 
 
 101
 The terms "owner" and "operator," as used in section 107(a)(2), are defined in the statute as "any person owning or operating such facility," 42 U.S.C. § 9601(20)(A)(ii), a definition that is, at best, circular and unhelpful. At least one court has observed that "[t]he circularity strongly implies ... that the statutory terms have their ordinary meanings rather than unusual or technical meanings." Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 156 (7th Cir.1988). Further, it is noteworthy that the definition of "owner" explicitly excludes one whose ownership interest is merely that of a stockholder and who does not participate in management of the facility, 42 U.S.C. § 9601(20)(A)(iii), suggesting that one who does participate in management is accordingly susceptible to liability, see United States v. Kayser-Roth Corp., 910 F.2d 24, 26 n. 6 (1st Cir.1990). Finally, "person" is defined expansively as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21). The breadth of this definition plainly leaves room for a parent corporation. See Kayser-Roth, 910 F.2d at 25 n. 5.
 
 
 102
 The first question presented by this appeal is whether a parent corporation may be considered an "operator" under section 107(a)(2) when its subsidiary is the "owner." The district court determined that a parent corporation may face potential liability as an operator of a contaminating facility because the plain language of section 107(a)(2) indicates that Congress intended to impose liability on any entity actually operating a facility, regardless of the nature of the entity's ostensible interest in the facility. It is a conclusion with which I agree; indeed, it is a conclusion that the vast majority of circuits--eight out of nine considering the question--have reached as well. Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp., 90 F.3d 671, 673-74 (2d Cir.1996); Schiavone v. Pearce, 79 F.3d 248, 253-55 (2d Cir.1996); FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833, 842 (3d Cir.1994) (en banc ); Lansford-Coaldale Joint Water Authority v. Tonolli Corp., 4 F.3d 1209, 1221-22 (3d Cir.1993); Jacksonville Elec. Auth. v. Bernuth Corp., 996 F.2d 1107, 1110 (11th Cir.1993); John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 408 (1st Cir.1993); see Kaiser Aluminum and Chem. Corp. v. Catellus Dev. Corp., 976 F.2d 1338, 1341-42 (9th Cir.1992); Kayser-Roth Corp., 910 F.2d at 27; see also United States v. TIC Investment Corp., 68 F.3d 1082, 1091-92 (8th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 842 (4th Cir.1992); cf. Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir.1994). But see Joslyn Mfg. Co. v. T.L. James & Co., 893 F.2d 80 (5th Cir.1990).
 
 
 103
 My colleagues offer several reasons for parting company with this impressive wealth of authority. First, they argue that courts have relied on the so-called remedial purpose of CERCLA to justify their conclusion that CERCLA should be given an expansive meaning, including a meaning that admits of liability for parent corporations as operators. Certainly, the shibboleth "remedial purpose" is a weak basis for legal analysis and I do not find it necessary to resort to it. But what the majority sees as the logical second step to a rejection of the remedial-purpose litany, namely, its "adhere[nce] to the tenet that liability attaches only to those parties who are culpable in the sense that they, by some realistic measure, helped to create the harmful conditions," is, to put it mildly, a non sequitur. (Maj. op. at 578.) Implicit in the majority's chosen "tenet" is rejection of the universally accepted principle that liability under CERCLA is both strict, as well as joint and several. See, e.g., Kayser-Roth, 910 F.2d at 26; FMC Corp., 29 F.3d at 835. Whether CERCLA's purpose is "remedial" or not, the sounder proposition, I think, is that liability attaches only to those entities whom Congress has singled out for liability. For the reasons set forth below, the statutory language leaves no room to doubt that Congress has singled out operators for liability, irrespective of their corporate form.
 
 
 104
 The majority is also critical of the district court's language that liability should be predicated on a "new, middle ground," and contends that this choice of language makes it unclear "whether the [district court's] basis for finding parental liability as an operator ... is the actual operation of the subsidiary's business or ... the exertion of power or influence through active participation in the subsidiary's business." (Maj. op. at 579.) It may be that trial courts' inventive "new, middle ground" expression is more conferring than clarifying, but my colleagues' conclusion that the district court's holding "threaten[s] the efficacy of time-honored liability protections afforded by the corporate form," simply does not follow. And my colleagues' ultimate conclusion, that a parent can only be found liable "when the requirements necessary to pierce the corporate veil are met," contradicts the plain language of section 107(a)(2). Moreover, it is a conclusion that begs the question this case presents, which, under subsection (a)(2), is not whether a parent corporation may be held vicariously liable for abuse of its subsidiary's corporate form--clearly it may--but whether Congress has created direct liability if the facts show that the parent corporation was the actor actually operating a contaminating facility. Stated differently, the issue is whether Congress has excused a parent corporation that is in fact operating a contaminating facility from direct liability, simply because it is doing so in the name of a corporate subsidiary. The majority's belief that such an excuse may be found in the statute does not, for me, withstand close scrutiny.
 
 
 105
 The structure of the statute, on its face, requires a recognition that " 'owner' liability and 'operator' liability denote two separate concepts and hence require two separate standards for determining whether they apply." Lansford-Coaldale, 4 F.3d at 1220. " 'CERCLA's language ... indicates an intent to hold a corporation liable for the environmental violations of its subsidiaries and sister corporations, if it is otherwise determined to have operated the facility in question.' " Schiavone, 79 F.3d at 255 (quoting Lansford-Coaldale, 4 F.3d at 1221 n. 11). As the Kayser-Roth court observed,
 
 
 106
 Congress, by including a liability category in addition to owner ("operators") connected by the conjunction "or," implied that a person who is an operator of a facility is not protected from liability by the legal structure of ownership. Given this grammatical construction and the broad definition of "person," corporate status, while relevant to determine ownership, cannot shield a person from operator liability.
 
 
 107
 Kayser-Roth, 910 F.2d at 26; see Schiavone, 79 F.3d at 254. In short, direct CERCLA liability under subsection (a)(2) may be predicated on one's status as an owner or on one's status as an operator.
 
 
 108
 Alternatively, of course, a parent corporation may also be derivatively liable if circumstances warrant piercing the corporate veil in order to treat that parent corporation as an owner, when its subsidiary is in fact the owner. The majority opinion conflates and confounds the two types of liability, which are analytically distinct, and erroneously concludes that the latter is the exclusive basis for liability. See Sidney S. Arst Co., 25 F.3d at 420; cf. Schiavone, 79 F.3d at 253. As a result, the majority's analysis founders on a perceived tension between the standard of a derivative liability arising out of common-law principles of corporate law and the standard of direct liability arising out of an application of the statutory language of CERCLA. The tension is chimerical. The statute explicitly provides for distinct, direct operator liability, and "the basis for such operator liability is wholly independent of any liability on the part of" the subsidiary, Schiavone, 79 F.3d at 254; it is a direct liability that "stem[s] directly from [the parent's] control over the plant," that is, its own actions as an operator, id. The mere fact that derivative owner liability requires a veil-piercing analysis simply does not speak to the appropriate analysis of direct operator liability.
 
 
 109
 As previously alluded to, many courts have analyzed the issue of direct operator liability of a parent corporation. Most have followed the approach of Kayser-Roth, in which the court declared that "[t]o be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary." 910 F.2d at 27. "This standard requires an investigation into the relationship between the parent and subsidiary, in order to reveal the requisite level of corporate involvement." John S. Boyd, 992 F.2d at 408. Thus, the degree of control required is "more ... than simple ownership and the general authority or control that comes with it." Certain Underwriters, 90 F.3d at 674. In Lansford-Coaldale, 4 F.3d 1209, the court embraced the Kayser-Roth standard, emphasizing that "operator liability may be established even without evidence that a [parent] corporation controlled the environmental decisions of an affiliated corporation as long as there exist other factors which sufficiently demonstrate pervasive control." Id. at 1222 n. 13. Similarly, in Jacksonville Electric, 996 F.2d 1107, the court agreed that the test for direct parent corporation liability as an operator was whether the parent " 'exercises actual and pervasive control of the subsidiary to the extent of actually involving itself in the daily operations of the subsidiary. Actual involvement in decisions regarding the disposal of hazardous substances is a sufficient, but not a necessary, condition to the imposition of operator liability.' " Id. at 1110 (citation omitted). As is clear from the language of these cases, and as the Kayser-Roth court emphasized, it would "obviously not [be] the usual case that the parent of a wholly owned subsidiary is an operator of the subsidiary." Kayser-Roth, 910 F.2d at 27; see John S. Boyd, 992 F.2d at 408.
 
 
 110
 Among the many courts that have recognized that a parent corporation may be directly liable as an operator under section 107(a)(2), there has been a difference of opinion "as to whether operator liability should be predicated on the actual control one corporation has over the other, or whether the corporation's capacity or authority to control is sufficient." Lansford-Coaldale, 4 F.3d at 1220. The minority view has been adopted by the Fourth and Ninth Circuits, which would hold a parent corporation directly liable as an operator not because the parent corporation actually controlled the subsidiary, but rather because it had the authority to do so. See, e.g., Nurad, 966 F.2d at 842; Kaiser Aluminum, 976 F.2d at 1341. Those courts have justified their test as "one which properly declines to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup." Nurad, 966 F.2d at 842.
 
 
 111
 This view, I think, goes too far, because it assigns liability to the parent corporations beyond that intended by Congress. But in holding, as the majority of circuits have, that a parent corporation may be liable when it actually operates the facility in question, a court simply faithfully interprets plain statutory language.
 
 
 112
 Only the Fifth Circuit has adopted the limited view of operator liability described in the majority opinion here, in which the corporate form of the alleged operator is dispositive. The Joslyn court framed its inquiry as being whether to "impose direct liability on parent corporation for the violations of their wholly owned subsidiaries." Joslyn, 893 F.2d at 81. This somewhat disingenuous framing of the question ignores the direct link contemplated by the majority of other courts that have discussed operator liability, and suggests that operator liability for parent corporations, like owner liability, would simply be another type of derivative liability, albeit of a less demanding nature than corporate-veil-piercing. The Joslyn court reasoned that because "CERCLA does not [explicitly] define 'owners' or 'operators' as including the parent company of offending wholly-owned subsidiaries," id. at 82, there can be no operator liability for parents in the absence of veil-piercing. This analysis completely misses the point, which is that since a parent corporation is certainly within the statutory definition of "person," the relevant question is simply whether the particular corporation was, in fact, an operator of the facility in question. Thus, the Joslyn court's invitation to Congress to "extend liability to parent corporations" if it wishes to do so, id. at 83, is simply meaningless. It is obvious that CERCLA does extend liability to all corporations, including parent corporations, so long as they satisfy the statutory prerequisite that they be operators. I note, too, that another panel of the Fifth Circuit, in a case decided after Joslyn, observed in dicta that individual shareholders or officers could be held directly liable as an operator, when "they themselves actually participate in the wrongful conduct prohibited by the Act," and recognized that "this personal liability is distinct from the derivative liability that results from 'piercing the corporate veil.' " Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc., 931 F.2d 327, 330 (5th Cir.1991). The Riverside holding indicates, at a minimum, a reluctance within the Fifth Circuit to broadly apply Joslyn.
 
 
 113
 In sum, I conclude, as the district court did, that a parent corporation may be held directly liable as an operator of a contaminating facility under section 107(a)(2) if the facts of the case show that its domination and control of the subsidiary corporation ostensibly operating the facility is so pervasive that the parent is the operator in fact.
 
 B.
 CPC's Liability Under Section 107(a)(2)
 
 114
 In addition to generally repudiating the possibility of direct operator liability for parent corporations, which has been adopted in a majority of circuits considering the question, my colleagues have a factual dispute with the district court. That is, given my conclusion that CERCLA plainly contemplates the possibility of direct operator liability for parent corporations, the analysis necessarily turns to whether such liability is appropriately imposed here: whether CPC, as a factual matter, operated the facility. My colleagues acknowledge that, arguendo, "where the parent directly operates the facility itself, either independently of its subsidiary, or as an actual co-operator alongside the subsidiary," liability would be appropriate, but they assert that this theory "is not the one relied upon by the district court and, in any event, is not supported by the facts in the record before us." (Maj. op. at 581.) This assertion simply belies the record and the district court's opinion, and further, it fails to recognize that our review on this point is limited to review for clear error. Lansford-Coaldale, 4 F.3d at 1219; John S. Boyd, 992 F.2d at 408; Kayser-Roth, 910 F.2d at 27.
 
 
 115
 The district court found that CPC, Ott II's parent corporation, so totally and completely controlled Ott II that CPC was the actual operator of the contaminating facility in Dalton Township, Michigan. There is an abundance of evidence in the record to support this factual finding, and in all events, not even my colleagues claim it is clearly erroneous. It follows, therefore, as the district court found, that CPC is directly liable under section 107(a)(2) as the operator of the site. I agree.
 
 
 116
 Section 107(a)(2) provides that a parent corporation is liable if it is the operator-in-fact of the facility as indicated by the extent of its domination and control of the subsidiary, the ostensible operator. The district court pointed out that some of the factors relevant to deciding whether the parent is the operator-in-fact include considerations such as the parent corporation's involvement in the subsidiary's board of directors and daily operations, and the parent corporation's control over the subsidiary's policy making in areas such as personnel, finance, and waste disposal. Also relevant are the facts leading up to the subsidiary's origin and the reasons for its existence, and the parent's level of financial monitoring and its cooperation or consolidation with the subsidiary's accounting, legal, and research functions.
 
 
 117
 The specific facts with regard to CPC, as found by the district court, are these:
 
 
 118
 From CPC's acquisition of Ott II in October 1965 through April 1966, all four directors on Ott II's board were CPC officers. Over the next three and one-half years, at least three of the eight board members were officers of CPC, and for the following two and one-half years, until CPC sold Ott II, CPC officials comprised the majority of the then eleven-director board. At all times during Ott II's existence, the chairman of its board was a high-level CPC executive, appointed by CPC's president. In addition, the managers of Ott II who exerted active control over the subsidiary's day-to-day activities also were officers of CPC. Arnold Ott, who had been chief executive officer of Ott I, continued as Ott II's chief executive officer until 1969, during which time he also was CPC's vice president for scientific research and president of CPC's development company, a subsidiary with oversight responsibility for several CPC subsidiaries including Ott II. In addition, James Eiszner, who had been Ott I's vice president of marketing, served as Ott II's president from 1967 to 1970. During Eiszner's tenure with Ott II, he also served as vice president of CPC's development company, and eventually became CPC's chief executive officer. Moreover, Eiszner, in particular, was criticized during his tenure as an Ott II official for paying too much attention to his CPC responsibilities and not enough attention to Ott II. Beverly Warner served as Ott II's chief executive officer from 1970 until it was sold in 1972, at the same time serving as president of CPC's development company.
 
 
 119
 Not only did CPC participate in Ott II's environmental matters via the CPC's environmental affairs director, G.R.D. Williams, but it was instrumental in setting Ott II's environmental policies. For example, because Williams did not believe Ott II needed a biological waste treatment facility, Ott II officers abandoned presenting plans for such a facility at a meeting with the state of Michigan. Moreover, Williams repeatedly controlled the interaction between Ott II officials and state and federal regulators, and instructed Ott II's officers "to consult with CPC before responding to regulatory questionnaires or other inquiries." CPC Int'l, Inc. v. Aerojet-General Corp., 777 F.Supp. 549, 561 (W.D.Mich.1991). Finally, as the district court found, CPC's involvement in Ott II's financial affairs involved more than mere review and oversight. For example, CPC made loans to Ott II in excess of $5 million, while assuming many of Ott II's existing loans. In addition, CPC commingled its funds with Ott II's funds. CPC also limited the amount of capital expenditures that Ott II could approve without further approval by CPC's board of directors. As to personnel matters, CPC repeatedly participated in Ott II's labor negotiations with local unions.
 
 
 120
 Based on these and many other findings, the district court concluded that "[t]he evidence shows a level of participation and control by CPC that exceeds the bounds of an interested investor and enters the realm of an active operator." Id. at 575. These findings are amply supported in the record. As I have said, my colleagues do not claim they are clearly erroneous. Accordingly, the district court's conclusion that CPC was directly liable under section 107(a)(2) as an operator should be affirmed.
 
 II.
 
 121
 Aerojet's Liability Under Section 107(a)(1)
 
 
 122
 The district court found Aerojet liable as a present "owner" of a contaminated facility under section 107(a)(1). It did so after finding that the facts justified piercing the corporate veil that thinly shielded Cordova/Michigan from Aerojet. My colleagues hold that the district court erred because it misapplied Michigan law: "[The district court's findings do] not suggest that the company acted to subvert justice or with fraudulent intent or otherwise sought to distort the legitimate purposes of the corporate form." (Maj. op. at 582.)
 
 
 123
 While there is no question that fraudulent intent or a subversion of justice justifies piercing the corporate veil, there is ample authority under Michigan law for finding parent corporation liability through veil piercing for a less egregious reason, such as unjustified use of the corporate form. Indeed, the Michigan Supreme Court has only recently restated the applicable rule:
 
 
 124
 Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities. This presumption, often referred to as a "corporate veil," may be pierced only where an otherwise separate corporate existence has been used to "subvert justice or cause a result that [is] contrary to some other clearly overriding public policy." More specifically, Michigan courts have generally required that a subsidiary must "become 'a mere instrumentality' of the parent" before its separate corporate existence will be disregarded.
 
 
 125
 Seasword v. Hilti, Inc., 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (emphasis added) (citations omitted); see Wells v. Firestone Tire and Rubber Co., 421 Mich. 641, 364 N.W.2d 670, 675 (1984); Herman v. Mobile Homes Corp., 317 Mich. 233, 26 N.W.2d 757, 762-63 (1947); Potter v. Michigan Bell Tel. Co., 246 Mich. 198, 224 N.W. 438, 439 (1929). But the most instructive language of Seasword, for purposes of this case, is in the court's illustrative listing of "relevant factors ... showing that a subsidiary is a 'mere instrumentality' of its parent":
 
 
 126
 [T]he parent and subsidiary shared principal offices, or had interlocking boards of directors or frequent interchanges of employees, that the subsidiary is the parent's exclusive distributing arm, or the parent's revenues are entirely derived from sales by the subsidiary.
 
 
 127
 Seasword, 537 N.W.2d at 224 n. 10.
 
 
 128
 The coincidence between these hypothetical factors and the reality of Aerojet's relationship with its subsidiaries is, to put it mildly, striking. The district court found that Aerojet was the 100% shareholder of Cordova/California; that Cordova/California, in turn, was the sole shareholder of Cordova/Michigan; and that the boards of directors of Cordova/California and Cordova/Michigan were titular only, not even convening for meetings. At least twenty Aerojet officers simultaneously held the same or nearly identical positions in Cordova/California and Cordova/Michigan. Aerojet so completely controlled the finances of all companies that neither Cordova/California nor Cordova/Michigan were permitted to maintain separate bank accounts. In addition, there was evidence that Aerojet used Cordova/Michigan by transferring to Cordova/California millions in worthless debt owed to Aerojet by Cordova/Michigan, effectively canceling debt owed by Aerojet to Cordova/California. These findings are supported by the record and are not clearly erroneous. The evidence established that Cordova/Michigan operated as a "mere instrumentality" of Aerojet.
 
 
 129
 Even more compelling are the findings of the district court regarding Cordova/Michigan's corporate purpose. When Aerojet began negotiations with MDNR for the Dalton Township property, Aerojet negotiated side-by-side with its then-unincorporated division, Cordova. After Aerojet entered two short-term stipulations with MDNR, and merely eleven days before the sale was concluded, Aerojet incorporated Cordova as a wholly-owned subsidiary. Although Aerojet had initially drafted the stipulation and consent order with MDNR, it was "Cordova Chemical Company" that actually signed the agreement. Then, in November 1978, with the remodeling of the facility complete and manufacturing about to begin, Cordova/California incorporated Cordova/Michigan, transferring to it Cordova/California's ownership of the facility. Despite the separate corporate form of Cordova/Michigan, throughout operations, Aerojet actively participated in negotiations with prospective buyers for the possible sale of the facility. Once Cordova/Michigan ceased operations at the site, it was Aerojet that took responsibility for leasing portions of the site to third parties. It is clear that Aerojet took pains to insulate itself from environmental liability for the situation they knew existed at the site. Aerojet admits as much in its brief:
 
 
 130
 By using well-capitalized, non-fraudulent, separate corporate subsidiaries, such as Cordova/California and then Cordova/Michigan, Aerojet could justify an attempt to reclaim and make the waste Site productive without risking all of its corporate assets. A rule of law imposing enormous environmental liability on parent corporations whose subsidiary neither perpetrated a fraud nor contributed to actual contamination would result in contaminated waste sites being permanently abandoned as unproductive, orphan properties, because no rational corporate officer could support a decision to rehabilitate a contaminated site if such liability were unavoidable.
 
 
 131
 Thus, Aerojet admits that Cordova/Michigan was established solely as a facade, to avoid any legal obligation to pay for further environmental cleanup at the site. Under Michigan law, its admission is sufficient to justify piercing the corporate veil. See Potter, 224 N.W. at 440. As Aerojet points out, it is possible that a refusal to allow a prospective purchaser of a contaminated site to avoid liability will result in a scarcity of willing buyers. Certainly, both EPA and MDNR have a substantial interest in locating conscientious purchasers, who are willing to reclaim environmentally corrupt facilities. However, there is no evidence that the Michigan courts would view this interest as an exception to the state's veil-piercing standard, especially in light of the competing interest in imposing environmental cleanup costs on private industry rather than on taxpayers. Congress certainly was not deterred by this argument, given its balancing of interests in favor of imposing liability on new owners. Moreover, Aerojet and the Cordovas are not blameless, as they would have the court believe. The district court found that the entities actively contributed to the contamination and then failed to take remedial action, despite knowledge that contamination was continuing to migrate.
 
 
 132
 Accordingly, the district court's conclusion that, by piercing the corporate veil, Aerojet may be held liable as an owner under 42 U.S.C. § 9607(a)(1) should be affirmed.
 
 
 133
 I further agree with the district court that Aerojet was directly liable as an operator under section 107(a)(2):
 
 
 134
 In light of the same facts that were probative in concluding Aerojet is liable under section 107(a)(1), the court concludes that Aerojet operated the site through active participation and pervasive control over the businesses of both Cordova/California and Cordova/Michigan.
 
 
 135
 As with CPC's involvement with Ott II, Aerojet's participation and control over the board, management and decision-making at Cordova/California and Cordova/Michigan shows that the parent operated the facility. Aerojet's conduct toward its subsidiaries extended well beyond the activities that are merely indicative of a parent's general oversight of a wholly owned subsidiary.
 
 
 136
 Accordingly, the court concludes the [sic] Aerojet is directly liable as an operator under section 107(a)(2).
 
 
 137
 CPC Int'l, Inc., 777 F.Supp. at 580.
 
 III.
 
 138
 Third-Party Defense Under Section 107(b)(3)
 
 
 139
 Finally, I do not agree that the district court should be required, upon remand, to "revisit its treatment of the [third-party] defense raised by Aerojet, Cordova/California, and Cordova/Michigan" under section 107(b)(3). (Maj. op. at 582-83.) To succeed under section 107(b)(3), the defendants are required to prove all four elements of a third-party defense, which are:
 
 
 140
 1. That they did not contribute to the contamination;
 
 
 141
 2. That they were not in a direct or indirect contractual relationship with any person who, in connection with the contractual relationship, caused the contamination;
 
 
 142
 3. That they exercised due care throughout their ownership or operation of the contaminating facility; and
 
 
 143
 4. That they protected against those acts and omissions of the polluting persons, and the consequences of those acts and omissions, that were foreseeable.
 
 
 144
 See 42 U.S.C. § 9607(b)(3); see also Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 325 (7th Cir.1994).
 
 
 145
 The district court found that the defendants failed to carry their burden on all four elements of the section (b)(3) defense. My colleagues, in desiring that the district court "revisit its treatment of the defense" raised by the defendants, address only the "contractual relationship" ground. Even if the district court erred in its treatment of that element of the defense, its findings that the defendants have not carried their burden of proving the remaining three elements of the section 107(b)(3) defense, which my colleagues do not question, is amply supported in the record.
 
 
 146
 The district court committed no clear error in finding that the defendants demonstrated neither the exercise of due care nor the use of appropriate precautions. For example, in a May 1980 environmental risk report covering Aerojet and several subsidiaries including Cordova/Michigan, the defendants repeatedly stated their intent to take a head-in-the-sand approach with respect to the contamination problem:
 
 
 147
 The most significant environmental problems associated with the facility are those relating to the residues of past industrial occupants of the site. Management has adopted the position that any injury to others arising out of contamination from these residues is the responsibility of the State of Michigan Department of Natural Resources and that, accordingly, Cordova should insulate itself from any knowledge of, or involvement in monitoring these wastes.
 
 
 148
 The report went on to acknowledge that waste drums remained buried, despite completion of MDNR's removal efforts. Moreover, the report acknowledged that the stipulation entered into by Cordova and MDNR was never intended to resolve the contamination problem. In describing the responsibilities assumed by the parties under the stipulation, the report admitted that MDNR's duties were limited to removing 8700 drums and a portion of the contaminated soil and sludge, and that the stipulation's hold-harmless clause relieved the defendants only of liability arising out of these specified removal efforts. In addition, as the report acknowledged, the MDNR absolved the defendants of liability relating to procurement of an alternative community water source.
 
 
 149
 As the district court pointed out, and as the report confirms, the stipulation did not resolve responsibility for the remaining drums and contaminated soil and sludge, as well as responsibility for groundwater contamination. In this regard, the report specifically opined:
 
 
 150
 Between 65 and 100 monitoring wells for testing groundwater were either installed by Story or have been installed more recently under a State/Federal study of groundwater contamination at the site. The study is being carried out by several consulting organizations under contract to the state. Cordova management believes the studies show little or no contamination but has avoided any participation or liaison with the study teams.... Because of the possibility that Cordova's potential liability for groundwater contamination may have survived the Consent Order, it would appear desirable for Cordova management to keep abreast of current monitoring results. In addition, although a high chloride content would show continuation of problems from the old Story wastes, a high sulphate concentration would indicate seepage problems arising out of Cordova's current operations.
 
 
 151
 Fully aware that waste drums remained buried beneath the site and that the majority of the contaminated soil had not been removed, and cognizant of groundwater contamination to which they may have been contributing, the defendants believed the solution to these problems was to don blinders. Their willful blindness can hardly be characterized as the exercise of due care.
 
 
 152
 For the same reasons, it cannot be said that the defendants took adequate precautions to protect against the consequences of Ott II's and Story's omissions and acts. While the parties, in their briefs, debate whether reimplementation of the purge wells would have been an adequate precaution, they overlook the big picture. The defendants, fully aware that contamination problems on their property were not being addressed, chose to take no precautions to protect against the foreseeable consequences of these problems--namely, further migration.
 
 
 153
 Accordingly, because the defendants have failed to prove at least two of the requisite elements of the third-party defense, the district court properly held that they were not entitled to invoke it. It is simply unnecessary to consider whether they sustained their burden regarding the remaining two elements, including whether any of the pollution was the act of a third party "in connection with" the contractual relationship with the defendants.
 
 IV.
 
 154
 The judgment of the district court should be affirmed.
 
 
 
 [1]
 The district court noted that two hazardous chemicals--benzene and 1,2 dichloroethane--were found at the site and used during the Cordova period of ownership. Id. at 556, 579 n. 11. Although Cordova/Michigan, in an April 5, 1984 letter to the federal EPA, acknowledges generating small quantities of these materials for disposal, we find nothing in the record to support a finding that any additional release of hazardous substances occurred at the site during the Cordova period
 
 
 [2]
 42 U.S.C. § 9607(a) states, in part:
 Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
 (1) the owner and operator of a ... facility,
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances ...
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 (A) all costs of removal or remedial action....
 
 
 [3]
 Although it does not affect our resolution of the liability issue, we note that these negotiations occurred before the enactment of CERCLA
 
 
 [4]
 We do not conclude, as suggested by the dissent, "[t]hat piercing the corporate veil under Michigan law requires showing that the corporate form was used to 'subvert justice.' " Rather, it requires that the subsidiary be a "mere instrumentality" of the parent which is used either to subvert justice or to circumvent overriding public policy. In our view, none of these factors fairly characterize the relationship between CPC and Ott II
 
 
 [5]
 Thus, the dissent's characterization of our opinion as holding "that a parent cannot, as a matter of law, be held directly liable under 42 U.S.C. § 9607(a)(2) as an 'operator' of a facility owned by its subsidiary corporation" is mistaken
 
 
 [6]
 We note that, since this case was briefed and argued, the Supreme Court decided Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which potentially provides the MDNR with an Eleventh Amendment defense. Because this issue has not been raised by the parties through supplemental briefs and the resolution of the case with respect to the MDNR is not affected, we choose not to consider the impact of Seminole Tribe at this point in the proceedings
 
 
 [1]
 The Eleventh Circuit recently applied state law to determine the CERCLA liability of limited partners, see Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir.1996). That is not necessarily inconsistent with applying federal law in claims involving subsidiary corporations, however, since the danger of corporations creating subsidiary partnerships, as compared to subsidiary corporations, in order to evade CERCLA liability is fairly attenuated