# United States Court of Appeals

## For the First Circuit

No. 00-2038

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

KAYSER-ROTH CORPORATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Lipez, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lisi,[*] District Court Judge.

J. Daniel Berry, with whom William Carter, William S. Eggling and Ropes & Gray, were on brief, for appellant.
Joan M. Pepin, Attorney, Department of Justice, with whom John C. Cruden, Deputy Assistant Attorney General, John T. Stahr, Donald G. Frankel, Attorneys, Department of Justice, Lloyd Selbst, Senior Enforcement Counsel, and Nina Rivera, Office of General Counsel, Environmental Protection Agency, were on brief, for appellee.

December 3, 2001

*  Of the District of Rhode Island, sitting by designation.

**LIPEZ, Circuit Judge**.    In this appeal, Kayser-Roth Corporation (Kayser-Roth) seeks relief pursuant to Fed. R. Civ. P. 60(b)(5) from a 1990 declaratory judgment finding it liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., for future cleanup costs associated with a release of trichloroethylene at a facility of its subsidiary, Stamina Mills, Inc.  United States v. Kayser-Roth Corp., 724 F. Supp. 15 (D.R.I. 1989) (Kayser-Roth I).  Kayser-Roth asserts that the Supreme Court's decision in United States v. Bestfoods, 524 U.S. 51 (1998), renders the prospective application of the declaratory judgment "no longer equitable" within the meaning of Rule 60(b)(5).  Reviewing the Kayser-Roth I judgment in light of Bestfoods, the district court concluded that the principles of direct and derivative liability under CERCLA articulated in Bestfoods would not have altered that original judgment.  United States v. Kayser-Roth Corp., 103 F. Supp. 2d 74 (D.R.I. 2000) (Kayser-Roth II).  Kayser-Roth appeals that determination, and we affirm.

## I.

### A.  Factual Background

We draw these background facts from Kayser-Roth I.  During the time relevant to this litigation, Stamina Mills was a wholly-owned subsidiary of Kayser-Roth.[1]  Along with another Kayser-Roth subsidiary and other corporations, Stamina Mills was also part of Kayser-Roth's "Crown Division," a designation created for internal organization purposes only.

Stamina Mills ran a textile manufacturing operation in the village of Forestdale, in the City of North Smithfield, Rhode Island.[2]  The Forestdale mill building had been located on the north side of the Branch River for decades.  At one time, the textile production at the Forestdale facility used a soap scouring system to remove oil and dirt

[1] Stamina Mills no longer exists.  For a more involved corporate history, we refer to the district court's decision in Kayser-Roth I, 724 F. Supp. at 18-21.

[2] The record is unclear whether, at the time the contamination occurred at the Forestdale site, Stamina Mills had commenced yarnspinning operations at another location in Woonsocket, Rhode Island.

from newly-woven fabric. As a result of complaints about discharge and pollution into the Branch River, the soap scouring method was replaced with a system using trichloroethylene (TCE) in March 1969. During one delivery of TCE before November 1969, an indeterminate amount of TCE spilled onto the Stamina Mills property. In addition to this accidental release, there was evidence that Stamina Mills would deposit used quantities of TCE bottoms in a landfill on its property. One witness at trial testified that he saw a truck back up to the landfill to dump a purplish fluid with oily texture. That witness also testified that the odor of TCE emanated from Stamina Mills' building.

In 1979 the Rhode Island Department of Health determined that residential wells near the Stamina Mills site in the Forestdale community contained elevated levels of TCE. In September 1982, the Environmental Protection Agency conducted a hydrogeological study and identified the Stamina Mills site as the source of the TCE. The site was subsequently added to the National Priorities List for cleanup funding. The EPA's costs related to remedial measures at the residential wells and the Stamina Mills site, as well as enforcement, totaled $660,612.71. The Department of Justice incurred an additional $185,879.62 in enforcement costs.

B. 1990 Declaratory Judgment

In 1988, the United States filed an action (the 1988 action) against Kayser-Roth pursuant to 42 U.S.C. § 9607(a)(2) seeking reimbursement of its response costs and a declaration that Kayser-Roth would be liable for any additional response costs incurred in the future relating to the Stamina Mills site.[3] It asserted, among its six liability theories, that Kayser-Roth was liable as an "operator" and an "owner" under CERCLA. Judge Boyle found Kayser-Roth liable under both theories. See Kayser-Roth I, 724 F. Supp. at 23-24.

1. Operator Liability

Judge Boyle interpreted the standard for operator liability of a parent corporation as follows: "The parent corporation's control over the subsidiary's management and operations is an essential element of proving operator liability on the parent's part." Id. at 22. Accordingly, Judge Boyle focused on "whether Kayser-Roth exercised control over Stamina Mills management and operations sufficient to find that Kayser-Roth was a de facto operator." Id.

_____

[3] Section 9607(a) states, in pertinent part: "[T]he owner and operator of a vessel or a facility . . . shall be liable for . . . all costs of removal or remedial action incurred by the United States Government . . . ." Section 9601(20)(A)(ii) provides that "any person owning or operating such facility" is an owner or an operator.

-3-

Based upon the evidence heard at a bench trial, Judge Boyle determined that Kayser-Roth was liable as an "operator" under CERCLA. Id. He specifically found the following:

> Kayser-Roth exercised pervasive control over Stamina Mills through, among other things: 1) its total monetary control including collections of accounts payable; 2) its restrictions on Stamina Mills' financial budget; 3) its directive that subsidiary-governmental contact, including environmental matters, be funneled directly through Kayser-Roth; 4) its requirement that Stamina Mills' leasing, buying or selling of real estate first be approved by Kayser-Roth; 5) its policy that Kayser-Roth approve any capital transfer or expenditure greater than $5,000; and finally, 6) its placement of Kayser-Roth personnel in almost all Stamina Mills' director and officer positions, as a means of totally ensuring that Kayser-Roth corporate policy was exactly implemented and precisely carried out. These are only examples of Kayser-Roth's practical total control over Stamina Mills' operations.

Id. As further evidence of control, Judge Boyle made findings specific to Kayser-Roth's "actions with regard to environmental matters affecting Stamina Mills":

> Illustrative of Kayser-Roth's control are its actions with regard to environmental matters affecting Stamina Mills. Kayser-Roth had the power to control the release or threat of release of TCE, had the power to direct the mechanisms causing the release, and had the ultimate ability to prevent and abate damage. Kayser-Roth knew that Stamina Mills employed a scouring system that used TCE; indeed, Kayser-Roth approved the installation of that system after mandating that a cost-benefit study be made by Stamina Mills. Kayser-Roth not only had the capacity to determine the use of TCE but also was able to direct Stamina Mills on how the TCE should have been handled. There are other examples of Kayser-Roth's participation in Stamina Mills' environmental decision-making. Evidence was introduced that Kayser-Roth issued a directive to its subsidiaries, including Stamina Mills, requiring that Kayser-Roth's Legal Department be notified of any governmental agency or court contact regarding environmental matters. Furthermore, when Stamina Mills was sued in 1974 by the United States for an illegal waste water discharge into the Branch River, the final decision on settlement was made by Kayser-Roth's directors.

Id. at 22-23 (footnote omitted).

2. Owner Liability

In addition, Judge Boyle concluded Kayser-Roth was liable as an "owner" under a veil piercing theory, based "upon analysis of the factors relevant to piercing Stamina Mills' veil, and mindful of the liberal construction CERCLA must be afforded so as not to frustrate probable legislative intent." Id. at 23. Recognizing the preliminary issue as to whether state or federal common law veil-piercing standards should apply, Judge Boyle recited the veil-piercing factors required under each regime. See id. at 20. However, he ultimately left the choice-of-law issue unaddressed, on the basis that "the distinction between state law and a federal rule of decision is of little practical difference." Id. at 20. Judge Boyle then found that many of the factors applicable to the operator liability inquiry were also relevant to owner liability:

> Kayser-Roth has exhibited overwhelming pervasive control over Stamina Mills. Many of the same factors used in holding Kayser-Roth liable as an operator are relevant. Kayser-Roth's control over environmental matters; its policy of approving all capital expenditures of greater than $5,000; its stranglehold on income and expenses; its practice of placing Kayser-Roth personnel in Stamina Mills' director positions, thereby precluding other Stamina Mills executives from significant daily decision-making; and its overwhelming control over Stamina Mills' financial and operational structure add flesh to the skeletal proposition that Kayser-Roth's corporate existence should be disregarded. Accordingly, Stamina Mills' veil should be pierced to hold Kayser-Roth liable, not only because public convenience, fairness, and equity dictate such a result, but also due to the all encompassing control which Kayser-Roth had over Stamina Mills as, in fact and deed, an owner. Any other result would provide too much solace to deliberate polluters, who would use this device as an escape.

Id. at 24 (footnote omitted).

As a result of his liability determination, Judge Boyle entered judgment against Kayser-Roth in January 1990 for nearly $1 million in response costs previously incurred by the EPA and interest. In addition, he issued a declaratory judgment (1990 declaratory judgment) holding Kayser-Roth liable for "all further response costs incurred by the United States related to the Stamina Mills Site."[4]

---

[4] CERCLA authorizes entry of such a declaratory judgment. See 42 U.S.C. § 9613(g)(2)("In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or

On appeal, we affirmed Judge Boyle's decision as to Kayser-Roth's operator liability. <u>United States</u> v. <u>Kayser-Roth Corp.</u>, 910 F.2d 24, 27-28 (1st Cir. 1990). We specifically held that "[t]o be an operator . . . [a]t a minimum . . . requires active involvement in the activities of the subsidiary," and that the degree of control described in Judge Boyle's opinion was "more than sufficient" to impose operator liability on Kayser-Roth. <u>Id.</u> As the operator liability issue was dispositive, we did not address Kayser-Roth's liability as an owner under veil-piercing principles. <u>Id.</u> at 28 n.11.

---

actions to recover further response costs or damages.").

C.  1998 Cost Recovery Action

In March 1998, the United States filed before Judge Torres a second cost recovery action (the 1998 action) against Kayser-Roth, seeking $4.1 million in additional response costs incurred after the period covered by the 1990 judgment and $2.3 million in interest.  In its complaint, the government relied on the 1990 declaratory judgment finding Kayser-Roth liable for future response costs.

Shortly after the filing of this second cost recovery action, the Supreme Court decided United States v. Bestfoods, 524 U.S. 51 (1998)(discussed infra).  Consequently, Kayser-Roth filed a motion under Fed. R. Civ. P. 60(b)(5)[5] for relief from the liability determination in the 1990 declaratory judgment.[6]  As grounds therefor, Kayser-Roth argued that Bestfoods changed the CERCLA liability standards applied by Judge Boyle and thus rendered prospective application of his 1990 declaratory judgment unjust.

At oral argument before Judge Torres, Kayser-Roth explained that the relief sought under Rule 60(b)(5) would give Kayser-Roth the opportunity to have its liability determined anew under current law in the action before Judge Torres.  We share that understanding of the effect of Rule 60(b)(5) relief in this setting.  Relief, if granted, would not exonerate Kayser-Roth from liability with any finality, but rather would release Kayser-Roth from the prior declaratory judgment to the extent that this judgment imposes liability for future response costs.  The issue of liability under CERCLA would be back on the table, giving Kayser-Roth an opportunity to litigate its liability under current law in the context of the 1998 cost recovery action.

In considering Kayser-Roth's request for relief, Judge Torres found that the 1990 declaratory judgment, applied to Kayser-Roth for future response costs, would have prospective effect and would inflict undue hardship on Kayser-Roth, two requirements for relief under Rule

---

[5] Rule 60(b)(5) provides, in pertinent part: "On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding [when] . . . the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application."  The rule also requires that a motion under subsection five be brought "within a reasonable time."

[6] Seeking relief from the 1990 declaratory judgment, Kayser-Roth originally filed its Rule 60(b)(5) motion in the 1988 action (C.A. No. 88-325) in which that declaratory judgment was entered.  The district court appears to have consolidated the 1998 action (C.A. No. 98-160T) with the 1988 action.

60(b)(5).[7] See Kayser-Roth II, 103 F. Supp. 2d at 78-81. However, Judge Torres denied relief from judgment under Rule 60(b)(5) because of his conclusion that Kayser-Roth remained liable as both owner and operator under Bestfoods. Id. at 82, 85. Addressing operator liability first, Judge Torres reasoned:

> Judge Boyle expressly found that Kayser-Roth directed Stamina Mills's activities with respect to environmental matters, in general, and operation of the facility utilizing TCE, in particular. Judge Boyle also found that Kayser-Roth had directed activities at the site. Consequently, Bestfoods would not alter [Judge Boyle's] determination of "operator" liability as affirmed by the First Circuit.

Id. at 82. As to owner liability, Judge Torres held that Bestfoods did not undermine Judge Boyle's veil-piercing analysis and upheld the determination that Kayser-Roth was liable as an owner. Id. at 85. The denial of the motion for relief under Rule 60(b)(5) prompted the instant appeal.

## II.

Fed. R. Civ. P. 60(b) empowers federal courts, in certain instances, to vacate judgments "'whenever such action is appropriate to accomplish justice.'" Teamsters, Chauffeurs, Warehouseman and Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 19 (1st Cir. 1992) (quoting Klapproot v. United States, 335 U.S. 601, 614-15 (1949)). In the application of this rule, we must recognize, inter alia, "the importance of finality as applied to court judgments." Id. We have identified certain criteria to determine whether relief from judgment is appropriate under Rule 60(b): "(1) timeliness, (2) the existence of exceptional circumstances justifying extraordinary relief, and (3) the absence of unfair prejudice to the opposing party." Id. at 20. In addition, to obtain relief under Rule 60(b), "[a litigant] must give the trial court reason to believe that vacating the judgment will not be an empty exercise" in any new proceedings. Id. Although the movant need not show "an ironclad claim or defense which will guarantee success at trial," it must at least demonstrate that it possesses "a potentially meritorious claim or defense which, if proven, will bring success in its

---

[7] We agree with Judge Torres that, if Kayser-Roth were no longer liable under Bestfoods, requiring Kayser-Roth to pay additional response costs in excess of $4 million imposes a hardship of sufficient magnitude to render the additional response costs award inequitable. The issue of prospective effect may present a closer question. However, the EPA did not present this argument to us on appeal after presenting it to Judge Torres. Thus, for purposes of this case, we treat the judgment as prospective in nature.

wake." Id. at 21; Lepkowski v. United States Dep't of Treasury, 804 F.2d 1310, 1314 (D.C. Cir. 1986). Purely conclusory allegations are not sufficient to establish the Rule 60(b) precondition. Teamsters, 953 F.2d at 21.

While the above principles govern Rule 60(b) relief generally, the precise contours of the applicable standard will depend on the particular subsection involved and the nature of the underlying judgment from which relief is sought.[8] Here, that subsection is Rule 60(b)(5), which provides for relief from judgment in situations where "it is no longer equitable that the judgment should have prospective application." Courts have granted Rule 60(b)(5) relief from a prior judgment on the basis of a significant change in the decisional law upon which that judgment relied. See, e.g., Agostini v. Felton, 521 U.S. 203, 215 (1997); Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992) (requiring moving party to show "a significant change either in factual conditions or in law"). Kayser-Roth specifically seeks Rule 60(b)(5) relief from the prospective effects of the 1990 declaratory judgment on account of a change in law under Bestfoods. Cf. 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2863 at 337 n.13 (2d ed. 1995) ("Relief seems to be possible under [Rule 60(b)(5)] from the prospective operation of a declaratory judgment."). As we explain herein, the Teamsters criteria set forth above provide an analytic framework well-suited to this circumstance.

Courts invoking the Teamsters criteria for Rule 60(b) motions have typically done so in the context of default judgments, where the merits were arguably never considered. See, e.g., Teamsters, 953 F.2d at 18-19 (grant of unopposed motion for summary judgment); de la Torre v. Continental Ins. Co., 15 F.3d 12, 14 (1st Cir. 1994)(same); Key Bank of Maine v. Tablecloth Textile Co. Corp., 74 F.3d 349, 354 (1st Cir. 1996); Coon v. Grenier, 867 F.2d 73, 76 (1st Cir. 1989)(motion to remove entry of default); Compton v. Alton S.S. Co., 608 F.2d 96, 102 (4th Cir. 1979). The 1990 declaratory judgment, the product of a well-litigated bench trial, is far different than a default judgment. Nevertheless, the inquiry here on the "meritorious defense" element of Rule 60(b)(5) relief is similar in two respects. First, the merits of the 1990 declaratory judgment have not yet been considered under Bestfoods. Second, as with vacating default judgments, the request to vacate the 1990 declaratory judgment contemplates a subsequent litigation to determine liability under current law. See supra. Hence, we deem it appropriate to employ the Teamsters criteria when relief is sought from

_____

[8] See Teamsters, 953 F.2d at 20 n.3 ("Often, the scope and shape of [the Teamsters criteria] depend, at least in part, on which clause of Rule 60(b) governs a particular motion.").

prospective operation of a declaratory judgment on account of a change in law.

Kayser-Roth argues that the Teamsters criteria cited by Judge Torres should not apply here because the motion for relief in Teamsters was filed under Rule 60(b)(6), not Rule 60(b)(5). That argument is unpersuasive. We contemplated that the Teamsters criteria would be generally applicable to Rule 60(b) motions, not just those under Rule 60(b)(6). Teamsters, 953 F.2d at 19-20 (noting that relief from "judgments under the aegis of Rule 60(b)" generally required that movant demonstrate identified criteria). Further, as already noted, see supra, the Teamsters criteria are well-suited to the motion at issue here, namely, one for relief from the prospective effect of a declaratory judgment on account of a change in law.

Kayser-Roth also argues that, even if the Teamsters criteria are applicable, Judge Torres improperly displaced the Teamsters "potentially meritorious claim or defense" formulation with a more stringent standard requiring definitive proof of an "ironclad" defense. Id. at 21. Kayser-Roth cites as evidence of this burden the following statement in Judge Torres' opinion: "Kayser-Roth must establish . . . that . . . it should be relieved from any further liability [under current law]." Kayser-Roth II, 103 F. Supp. 2d at 81. We note, however, that Judge Torres also concluded that "Bestfoods would not alter [Judge Boyle's] determination of 'operator' liability as affirmed by the First Circuit." Id. at 82. That conclusion is tantamount to a determination by Judge Torres that Kayser-Roth cannot establish a "potentially meritorious defense" to CERCLA liability under current law. The district court's formulation of the Rule 60(b)(5) standard was not a legal error.

**III.**

We now probe the heart of this appeal. Kayser-Roth asserts that United States v. Bestfoods, 524 U.S. 51 (1998), altered the law of parent liability under CERCLA and now potentially may afford Kayser-Roth with a defense to liability, rendering prospective application of the 1990 judgment unjust. To evaluate the merits of this argument, we must first examine the Bestfoods decision.

A. Bestfoods

Before delving into the Supreme Court's analysis in Bestfoods, we must look for context to the lower court opinions in that case. The United States brought suit in federal district court under CERCLA against numerous entities, including two parent corporations -- CPC International (CPC) and Aerojet -- for costs related to cleanup of industrial waste generated by each parent's respective wholly-owned subsidiaries. The district court held that operator liability attaches to a parent corporation

> only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates "operator liability" under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not.

CPC Int'l, Inc. v. Aerojet-General Corp., 777 F. Supp. 549, 573 (W.D.Mich. 1991). Applying these principles to the facts of the case, the district court found CPC and Aerojet liable as operators. Id.

In a rehearing en banc, the Sixth Circuit, affirming in part and reversing in part, held that

> where a parent corporation is sought to be held liable as an operator . . . based upon the extent of its control of its subsidiary which owns the facility, the parent will be liable only when the requirements necessary to pierce the corporate veil [under state law] are met. In other words, under the circumstances of this case, whether the parent will be liable as an operator depends upon whether the degree to which it controls its subsidiary and the extent and manner of its involvement with the facility, amount to the abuse of the corporate form that will warrant piercing the corporate veil and disregarding the separate corporate entities of the parent and subsidiary.

United States v. Cordova/Michigan, 113 F.3d 572, 580 (6th Cir. 1997). Because the record failed to support veil piercing under Michigan law,

-11-

the Court of Appeals reversed the district court's findings of operator liability for CPC and Aerojet. Id. at 580, 583.

The Supreme Court granted certiorari in Bestfoods "to resolve a conflict among the Circuits over the extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries." 524 U.S. at 60. The Court vacated the appellate decision and remanded the case to the district court. Id. In doing so, the unanimous Court recognized that "CERCLA liability may turn on operation as well as ownership, and nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." Id. at 64. To clarify the scope of direct operator liability under CERCLA, the Court addressed separately derivative (or indirect) liability for a parent corporation based on corporate veil piercing and direct liability based on the parent corporation's active operation of a facility.[9]

1. Derivative (Indirect) Liability

The Court began the analysis by affirming in a CERCLA context the general rule that a parent corporation is not liable for acts of its subsidiary. See id. at 61-62 ("[N]othing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible."). Thus, the Court rejected the notion that owner liability could attach to a parent corporation simply because its subsidiary owned a polluting facility. See id. at 62.

However, the Court also recognized "an equally fundamental principle of corporate law" that the corporate veil may be pierced to hold a parent corporation liable for acts of a subsidiary. Id. at 62. Finding "[n]othing in CERCLA [that] purports to rewrite this well-settled rule," the Court held that a parent may be charged with

---

[9] The Court noted that the indirect veil-piercing approach, generally linked to owner liability, may, in limited instances, bear upon derivative operator liability:

> Some courts and commentators have suggested that this indirect, veil-piercing approach can subject a parent corporation to liability only as an owner, and not as an operator. We think it is otherwise, however. If a subsidiary that operates, but does not own, a facility is so pervasively controlled by its parent for a sufficiently improper purpose to warrant veil piercing, the parent may be held derivatively liable for the subsidiary's acts as an operator.

524 U.S. at 64 n.10 (citations omitted).

-12-

derivative CERCLA liability for its subsidiary's acts only when the corporate veil may be pierced.[10]  Id. at 63-64.

### 2. Direct Operator Liability

The Court then addressed the circumstances under which a parent company would be directly liable for its own actions in operating a facility owned by its subsidiary.  Rejecting the Sixth Circuit view, the Court held that corporate veil-piercing is not a prerequisite to holding a parent directly liable as an operator:

> Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution.  This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice.  If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability.

Id. at 65 (citation omitted).

At the outset of the discussion, the Court defined "operator" under CERCLA as "someone who directs the workings of, manages, or conducts the affairs of a facility." Id. at 66.  It also, however, set forth a definition more specific to pollution-related activities at the facility:

> To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

Id. at 66-67.  Later in the opinion, the Court also recited the broader definition of "operator", noting that Congress' use of the word "to operate" means "something more than mere mechanical activation of pumps

---

[10] Acknowledging "significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing," the Court left this issue unaddressed. Bestfoods, 524 U.S. at 63 n.9.

and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." Id. at 71.

Applying these definitions, the Court identified two flaws with the district court's treatment of direct operator liability. First, the Court rejected the district court's erroneous "fusion of direct and indirect liability." Id. at 67. Rather, to keep direct and derivative liability distinct, the Court focused the direct "operator" liability inquiry not on the parent's interaction with the subsidiary, but rather on the parent's interaction with the facility: "The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language." Id. at 67-68 (internal quotation marks omitted)(quoting Lynda J. Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U.L.Q. 223, 269 (1994)).

Second, the Bestfoods Court noted that, "[i]n addition to (and perhaps as a reflection of) the erroneous focus on the [parent-subsidiary] relationship," the district court assumed erroneously that the actions of the joint officers and directors were necessarily attributable to the parent CPC. Id. at 68. In doing so, the district court failed to recognize that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." Id. at 69 (internal quotation marks omitted). The Court stated that,

> [s]ince courts generally presume that the directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary, it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility. The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as [parent] officers and directors, and not as [subsidiary] officers and directors, when they committed those acts.

Id. at 69-70 (internal quotation marks and citations omitted).

The Court described examples of activities that would be sufficient to find a parent directly liable as an operator of a polluting facility. The first example, identified by the Sixth Circuit, occurs "when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture." Id. at 71 (citing Cordova/Michigan, 113 F.3d at 579). Another occurs when

-14-

a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility.

Id. In a third scenario, "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." Id.

To distinguish a parental officer's oversight of a subsidiary from control over the operation of the subsidiary's facility, "norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points." Id. Elaborating on the general contours of these norms, the Court noted that liability would not arise out of activities involving the facility but "consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." Id. at 72 (citations and internal quotation marks omitted).[11] Thus, "[t]he critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." Id.

The Court found "some evidence that CPC engaged in just this type and degree of activity" at the plant in question. Id. Specifically, a CPC agent "played a conspicuous part in dealing with" the toxic risks emanating from the operation of the plant. Id. The district court found that this agent, G.R.D. Williams (Williams), served in the capacity of CPC's governmental and environmental affairs director and became heavily involved in environmental issues at CPC's subsidiary. Drawing no ultimate conclusions, the Court nevertheless found these findings sufficient "to raise an issue of CPC's operation of the facility" and therefore remanded to the district court for a "reevaluation" of CPC agents' role in operating the facility at issue. Id. at 72-73.

B.  Standard of Review

Before assessing Judge Torres' application of Bestfoods to Kayser-Roth's request for Rule 60(b)(5) relief, we need to explain the

_____

[11] The fact that an inquiry into corporate norms may involve factors relevant to veil-piercing would not render such analysis impermissible under Bestfoods. Cf. Carter-Jones Lumber Co. v. LTV Steel Co., 237 F.3d 745, 750 (6th Cir. 2001) (holding that "the fact that Ohio common law, in this case, allows veil-piercing under roughly the same conditions that CERCLA imposes direct liability is a coincidental fact about Ohio law" and does not violate Bestfoods).

standards of review we apply to his decision.  Rule 60(b)(5) rulings are generally reviewed for abuse of discretion.  See, e.g., Agostini, 521 U.S. at 238; King v. Greenblatt, 52 F.3d 1, 4 (1st Cir. 1995); Alexis Lichine & Cie. v. Lichine Estate Selections, Ltd., 45 F.3d 582, 586-87 (1st Cir. 1995); Theriault v. Smith, 523 F.2d 601, 602 (1st Cir. 1975). If, however, the district court's exercise of discretion is premised on an erroneous legal principle, we review that legal error de novo.  See Koon v. United States, 518 U.S. 81, 100 (1996) (noting that "the district court by definition abuses its discretion when it makes an error of law").  See also Agostini, 521 U.S. at 238 ("[T]he exercise of the discretion [in a Rule 60(b)(5) context] cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained."); Alexis Lichine, 45 F.3d at 586 ("[I]n reviewing the actions of the trial court, we may reverse only for error of law or abuse of discretion.").

Here, there is an important interplay between the decisions of Judge Boyle and Judge Torres.  Judge Torres interpreted Bestfoods and applied that interpretation to Judge Boyle's findings of fact to reach the conclusion that Kayser-Roth lacks a meritorious defense to operator liability under Bestfoods.  That conclusion amounts to a legal determination closely akin to a "substantial likelihood of success" ruling in the context of a motion for preliminary injunctive relief – a ruling which courts often treat as a legal conclusion subject to de novo review.[12]  We do the same here, reviewing de novo Judge Torres' conclusion that "Bestfoods would not alter [Judge Boyle's] determination of 'operator' liability as affirmed by the First Circuit." Kayser-Roth II, 103 F. Supp. 2d at 82.  However, we review for abuse of discretion Judge Torres' ultimate determination that the motion for Rule 60(b)(5) relief should be denied because continued application of the 1990

---

[12] See, e.g., Teva Pharm., USA, Inc. v. U.S. Food and Drug Admin., 182 F.3d 1003, 1007 (D.C. Cir. 1999); Associated Gen. Contractors of Am. v. Metropolitan Water Dist. of S. Cal., 159 F.3d 1178, 1180 (9th Cir. 1998)(reviewing de novo district court's legal conclusion as to likelihood of success on merits); Matter of Forty-Eight Insulations, Inc., 115 F.3d 1294, 1301 (7th Cir. 1997)("[W]e review the legal conclusion that a stay movant in bankruptcy proceedings has met the required threshold showing of likelihood of success de novo."). See also Hiller Cranberry Prods. v. Koplovsky, 165 F.3d 1 (1st Cir. 1999)(reviewing de novo district court's interpretation of veil-piercing law upon which it relied in making likelihood-of-success determination).

declaratory judgment is not unjust,[13] recognizing that his assessment of the meritorious defense element of the 60(b)(5) calculus was of primary importance in reaching his ultimate determination.[14]

## C.   Potentially Meritorious Defense

Kayser-Roth argues that it possesses a "potentially meritorious defense" to CERCLA liability under these Bestfoods principles sufficient to give a court "reason to believe that vacating the judgment will not be an empty exercise." Teamsters, 953 F.2d at 20. Focusing only on operator liability, as we did in our first decision in this case,[15] see 910 F.2d at 26-28 & n.11, we disagree.

In Kayser-Roth I, Judge Boyle held that "[t]he parent corporation's control over the subsidiary's management and operations is an essential element of proving operator liability on the parent's part." 724 F. Supp. at 22. Under Bestfoods, this reading of CERCLA is incorrect. Instead, the Supreme Court focused on the relationship between the parent and the facility itself: "The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." 524 U.S. at 68 (internal quotation marks omitted). The Court defined an operator as

> someone who directs the workings of, manages, or conducts the affairs of a facility. . . . [and] must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

---

[13] Similarly, the standard of review for the denial of a preliminary injunction is abuse of discretion. See Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999); Hiller Cranberry Products, Inc., 165 F.3d at 4.

[14] Drawing again upon our precedent in the preliminary injunction context, we note that "[l]ikelihood of success is the touchstone of the preliminary injunction inquiry." Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998). See Ross-Simmons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)("Likelihood of success is the main bearing wall of the four-factor framework."); Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

[15] We recognize that the district court decisions in Kayser-Roth I and Kayser-Roth II addressed both operator and owner liability. However, because we conclude that Kayser-Roth continues to be liable as an operator under current law, we need not reach the issue of Kayser-Roth's liability as an owner.

-17-

Id. at 66-67.

In its formulation of operator liability, we face an arguable ambiguity in the Bestfoods decision.  The Court appears to link the operational inquiry to the environmental matters noted above.  At other times, the Court articulates the relevant parent-facility relationship more broadly, suggesting an inquiry beyond the parent's direct involvement in pollution-related activities at the plant.  See id. at 66-73 (noting the term "operation" to include "the exercise of direction over the facility's activities").

Whatever the ambiguity created by these references, we think it is clear that direct operator liability requires an ultimate finding of the parent's involvement with "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id. at 66-67.  Indeed, at the end of Bestfoods the Court's attention to facts specific to the involvement of CPC (and its agent Williams) in its subsidiary's environmental matters indicates that the pollution-related focus is controlling.  See id. at 72-73.  This reading is consistent with that of other courts interpreting CERCLA liability since Bestfoods.  See, e.g., Carter-Jones Lumber Co. v. Dixie Distrib. Co., 166 F.3d 840, 846-47 (6th Cir. 1999) (reading Bestfoods in arranger liability context to require "active[] involve[ment] in the arrangements for disposal"); United States v. Green, 33 F. Supp. 2d 203, 217 (W.D.N.Y. 1998) (requiring participation in management of "facility's pollution control operations" for operator liability to attach).

Judge Boyle cited Kayser-Roth's "pervasive control" over Stamina Mills's environmental affairs, specifically at the Forestdale facility.  His findings place Kayser-Roth squarely within the Supreme Court's definition of direct operator liability.  Specifically, Judge Boyle found that

> [i]llustrative of Kayser-Roth's control are its actions with regard to environmental matters affecting Stamina Mills. . . . Kayser-Roth knew that Stamina Mills employed a scouring system that used TCE; indeed, Kayser-Roth approved the installation of that system after mandating that a cost-benefit study be made by Stamina Mills. . . . There are other examples of Kayser-Roth's participation in Stamina Mills' environmental decision-making.  Evidence was introduced that Kayser-Roth issued a directive to its subsidiaries, including Stamina Mills, requiring that Kayser-Roth's Legal Department be notified of any governmental agency or court contact regarding environmental matters.  Furthermore, when Stamina Mills was sued in 1974 by the United States for an illegal waste water discharge

into the Branch River, the final decision on settlement was made by Kayser-Roth's directors.

Kayser-Roth I, 724 F. Supp. at 22-23. Judge Boyle also found that Kayser-Roth essentially was in charge in practically all of Stamina's operational decisions, including those involving environmental concerns. Kayser-Roth made the ultimate decision to acquire the dry cleaning process using TCE. Moreover, Kayser-Roth issued a directive requiring Stamina Mills to notify the Kayser-Roth Legal Department of any correspondence with courts or governmental agencies regarding environmental matters. The only autonomy given the officers of Stamina Mills was that absolutely necessary to operate the facility on-site from day to day such as hiring and firing hourly employees and ordering inventory. Stamina was in fact and effect the serf of Kayser-Roth.

Id. at 19-20. Based on these findings, we conclude (as did Judge Torres) that "Judge Boyle expressly found that Kayser-Roth directed Stamina Mills's activities with respect to environmental matters, in general, and operation of the facility utilizing TCE, in particular." Kayser-Roth II, 103 F. Supp. 2d at 82.

Reliance on Judge Boyle's findings of Kayser-Roth's control over pollution-related operations at Stamina Mills' Forestdale mill might be questionable if Judge Boyle premised these findings upon evidence of actions of joint directors or officers of Kayser-Roth and Stamina Mills, thereby assuming that these actions were automatically attributable to Kayser-Roth. That attribution would be in conflict with Bestfoods. However, the record made before Judge Boyle reveals "control" by Kayser-Roth in the manner required by Bestfoods.[16]

---

[16] We recognize that Judge Boyle did his fact-finding while using an operator liability standard under CERCLA that is no longer appropriate. That fact is not an impediment to our continued reliance on his fact-finding. On direct appeal, we have the authority, upon correcting an error in the district court's legal analysis, to apply the correct rule of law to extant findings and facts in the record. See Cohen v. Brown Univ., 991 F.2d 888, 904 (1st Cir. 1993)("Even when a trial court has misconstrued the law, an appellate tribunal may avoid remanding if the record is sufficiently developed and the facts necessary to shape the proper legal matrix are sufficiently clear."); Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. 1992) (after district court misinterpreted law, appellate court applied correct rule of law to district court's factual findings and to uncontradicted facts in record); United States v. Mora, 821 F.2d

-19-

There is evidence that an agent of Kayser-Roth -- Norman Hinerfeld, executive vice-president of Kayser-Roth -- directly exerted operational control over environmental matters at the Forestdale facility. Hinerfeld was neither an officer nor a director of Stamina Mills. With "no hat to wear but the parent's," Hinerfeld acted solely on behalf of Kayser-Roth in his actions affecting Stamina Mills. Bestfoods, 524 U.S. at 71.

As Judge Boyle found, there were complaints about wastewater discharge from the Forestdale mill into the Branch River caused by the Forestdale mill's soap scouring system which removed oil and dirt from newly-woven fabric. Hinerfeld testified that he directed that cost studies be conducted to evaluate various solutions to that problem. He testified that he rejected the option of a lagoon system for treating wastewater, based on cost and space factors, and approved instead the selection of the dry cleaning system, installed in 1969, which he knew used TCE (which ultimately led to the TCE contamination at the site) based upon his assessment that it was "the least expensive solution [to the plant's environmental problems] that would work." John Merrick, Crown Division's controller, described Hinerfeld in his deposition testimony as the "lead man" in making this decision about how to handle this pollution problem.

Further, Hinerfeld played a critical leadership role in the settlement of a separate EPA action (unrelated to the instant litigation) filed in 1974 against Stamina Mills for an effluent discharge into the Branch River. Hinerfeld testified that, regarding the 1974 EPA suit, "[his] role was to see to it that prompt action was taken to comply with what the government wanted us to accomplish and then to see to it that the underlying causes of the government action were permanently corrected." According to Hinerfeld, Stanley Sheerr,[17] president of Kayser-Roth's Crown Division, recommended that, to rectify the pollution problem, the wet processing operation (which was the source of the effluent) be transferred from the Forestdale mill to

---

860, 869 (1st Cir. 1987) (same); see also Cameron v. Tomes, 990 F.2d 14, 20 (1st Cir. 1993) ("It is true that these findings were made in the framework of a legal analysis that we do not adopt, but the findings fit well enough into a due process framework and this court may affirm on any grounds supported by evidence."). That rule surely applies in this Rule 60(b) setting where the finality concerns are so prominent. See Teamsters, 953 F.2d at 19 (noting that Rule 60(b) "must be construed so as to recognize the importance of finality as applied to court judgments.").

[17] Like Hinerfeld, Sheerr was neither an officer nor a director of Stamina Mills.

another facility which was set up with a lagoon system that could handle the wastewater discharge.  Hinerfeld approved that recommendation and made "the final decision" to move wet processing from the Forestdale mill.  Although this 1974 lawsuit did not involve the TCE contamination at issue in this case, Judge Boyle nevertheless found it probative of Kayser-Roth's overall control over the handling of Stamina Mills's pollution problems.  Judge Torres agreed with that assessment, and so do we.

In the period when TCE from the Forestdale site contaminated residential wells, Hinerfeld played a central role in decisions about environmental compliance at the Forestdale mill and specifically the decision to implement the cleaning process that used TCE.  These activities went far beyond the "norms of parental oversight," reflecting instead direct control by the parent at the Forestdale facility over "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Bestfoods, 524 U.S. at 66-67.  Therefore, we conclude that Kayser-Roth cannot establish that Bestfoods gives it a potentially meritorious defense to operator liability under CERCLA for the release of contaminants at the Forestdale facility.  We agree with Judge Torres' conclusion that Bestfoods would not alter Judge Boyle's determination of Kayser-Roth's operator liability.[18]

## IV.

For the reasons stated above, we conclude that Judge Torres did not abuse his discretion in denying Kayser-Roth Rule 60(b)(5) relief from the 1990 declaratory judgment.

**Affirmed.**

---

[18] In support of Kayser-Roth's operator liability, the government points to evidence in the record of other instances outside the environmental area in which Kayser-Roth exercised control over the Forestdale facility rather than oversight.  Because we need not consider these instances in this case, we do not address whether such an inquiry might be appropriate.