Filed 9/13/19; Modified and certified for publication 10/15/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| ATLANTIC RICHFIELD COMPANY, | C086745 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201480001875CUWMGDS) |
| v. | |
| CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD, | |
| Defendant and Appellant. | |

The storied history of mining in California has adverse consequences, among them the discharge of toxic residues from mining sites. Plaintiff Atlantic Richfield Company (ARCO) filed a petition in June 2014 to overturn a March 2014 order of defendant Central Valley Regional Water Quality Control District[1] (Water Board) that sought to

---

[1] We have amended the title of this action to reflect the Water Board's own style for its name rather than the style used in the trial court. (See <https://www.waterboards.ca.gov/centralvalley/ > [as of Sept. 12, 2019].)

impose liability for remediation of metallic and acidic water pollution from an abandoned mine, the owner of which was the subsidiary of ARCO's predecessors in interest. The trial court granted the petition in January 2018. The Water Board appeals.

The Water Board contends the trial court applied the wrong legal standard to determine whether the ARCO predecessors incurred direct liability for control over activities resulting in the hazardous waste that the mine discharges. We agree that the trial court employed too restrictive a standard in evaluating the evidence, and therefore will reverse and remand for reconsideration of the record under the proper standard.[2] In light of this disposition, we do not need to address the Water Board's claim that the evidence did not support absolving ARCO even under the narrower standard, or the claim that the evidence established that the ARCO predecessors engaged in mining on their own at the mine before acquiring an interest in the mining company.

## FACTUAL AND PROCEDURAL BACKGROUND

Given that we find the evidence was filtered through the wrong legal standard, we do not summarize the entirety of the evidence in the record. We provide a few historical facts before providing the details of the trial court's ruling.

J. R. Walker began developing the Walker Mine in 1909, located to the north of Quincy and Portola in Plumas County. It is within the drainage of a watershed feeding ultimately into the north fork of the Feather River.

---

[2] In the event of a subsequent appeal, the parties might want to bear in mind that the CD format in which they submitted the nearly 10,000-page administrative record—while a laudable effort in preserving forests—is extremely difficult to navigate because the tabs exist as individual PDFs on the CD that cannot be cross-navigated directly and are each *individually* paginated, so finding a page within the tab requires calculating the math from the first Bates-numbered page of the tab. Combining the individual PDFs into a single document does not help, because the resulting overall pagination is at odds with the Bates numbering. (Their joint appendix does not suffer from these problems.)

The Walker Mining Company took title in 1915 and commenced mining in 1916. At one point in the 1930s, this was the largest copper mine in California.

International Smelting and Refining Company was a wholly owned subsidiary of the Anaconda Copper Mining Company, which later swallowed International in a merger. International/Anaconda acquired a controlling interest in the Walker Mining Company in 1918. Ultimately, ARCO became a successor through Anaconda's merger with an ARCO subsidiary in 1977 and the subsidiary's merger with ARCO in 1981. (See *Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co.* (S.D.N.Y. 2001) 138 F.Supp.2d 482, 484.)

The mine ceased production in 1941 and ceased all operations in 1943, after producing six-million tons of ore. The assets of the Walker Mining Company were sold in bankruptcy proceedings in 1945 and transferred to subsequent owners over the decades; the Water Board reached a settlement with the current owner of the property in 2004, which at present appears to be an inactive and insolvent corporation. By virtue of this and an earlier settlement against a previous owner, the Water Board has a right of access to the property under which it can authorize ARCO to conduct remediation activities.

The mine has 13 miles of flooded underground workings, comprising a total void volume estimated at 543 million gallons. The mine openings and tailings on the site discharge soluble copper and acidic mine drainage into surface waters, at times eliminating aquatic life 10 miles downstream from the mine. In 1987, the Water Board installed a concrete plug at a mine opening that was a primary source of mine leakage, which has eliminated most of the direct discharge but is causing a buildup of contaminated water inside the mine that is leaching into groundwater, and the mining waste on the surface also continues to be a source of water pollution.

3

The Water Board concluded that the mine and its tailings "have discharged metals and acid mine drainage" into the watershed "from at least the time production ceased in 1941, if not earlier." The ARCO predecessors "concurrently managed, directed, or conducted operations specifically related to the leakage or disposal of waste" in tandem with the Walker Mining Company. The activities "included exploration, ore location, mine development work . . . , and removal of ore, all of which directly resulted in the condition of discharge . . . at the mine and tailings." This involvement "went well beyond what is normally expected of a . . . corporate parent." The Water Board also concluded that the ARCO predecessors directly discharged waste from their own mining activities from 1916 to 1918. It therefore ordered ARCO to investigate and remediate the hazardous waste associated with the Walker Mine.

The trial court stated that the parties had agreed that "*United States v. Bestfoods* (1998) 524 U.S. 51 [141 L.Ed.2d 43] [(*Bestfoods*)] is controlling with respect to potential liability in a parent-subsidiary relationship under the . . . federal statutory scheme [analogous] to the water quality and remediation statutes in California . . . law." The trial court applied a six-category paradigm to the evidence of mining activity: (1) exploration and ore reserves development; (2) mine development; (3) ore extraction; (4) concentration of desired minerals; (5) new product distribution; and (6) waste disposal. "[ARCO] contends [that its predecessors were] involved in the first two phases of mining, and potentially the third, but [the evidence] falls far short of participati[on] in phase six. [ARCO] argues that because it did not participate in phase six, it cannot be held liable pursuant to *Bestfoods*. [Water Board] argues any participation in any of the six phases of mining is sufficient to satisfy *Bestfoods*, and that the evidence here demonstrates that [ARCO] engaged in at least phases one through three, and even supports a finding of participation in phase six." After reviewing several cases applying *Bestfoods*, the trial court concluded that it must find that the parent corporation

4

"participated in or directed activities specifically involving hazardous waste disposal or environmental regulation compliance," which was limited to evidence connected with category six activities.

Turning to the evidence, the trial court first found insufficient evidence that the ARCO predecessors directly engaged in ore extraction in 1916-1918 and were focused only on "exploration or mine development." With respect to any evidence in connection with the first three categories, "these phases of mining are insufficient to reach *Bestfoods* liability," and thus the court would "not discuss" such evidence. "Instead, the Court focuse[d] on [Water Board's] arguments that [the ARCO predecessors] directed waste disposal." The court then rejected the Water Board's assertion that the disposal of mine tailings "equates to disposal of hazardous waste," or that the ARCO predecessors directed disposal of this waste or disregarded the contaminated nature of water leaking from the mine. "[ARCO] was not involved in the sixth phase of mining, therefore [ARCO] was not involved in any sort of waste disposal."

## DISCUSSION

Central to this case is *Bestfoods*. Perforce, we digest *Bestfoods* at some length.

Interpreting the comparable (but not necessarily congruent)[3] federal statutory scheme for the abatement of hazardous waste, *Bestfoods* first discussed *derivative* liability of a parent corporation for the remediation of a subsidiary's hazardous waste. It noted a parent corporation is ordinarily not liable for the acts of a subsidiary in which it holds stock. (*Bestfoods*, *supra*, 524 U.S. at p. 61.) The parent nevertheless is subject to derivative liability for discharge of hazardous waste where circumstances are present

---

[3] See *Santa Clara Valley Water Dist. v. Olin Corp.* (N.D. Cal. 2009) 655 F.Supp.2d 1066, 1079 (discussing recoverable costs); cf. *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28, 37-38 (Water Code section 13304 must be construed as incorporating law of public nuisance in identifying responsible parties).

that would traditionally allow the application of the doctrine of piercing the corporate veil. (*Id*. at p. 62.) A parent may also have *direct* liability for hazardous waste if it is found to "operate" the activities of the facility responsible for the waste, which is not premised merely on its status as parent. (*Id*. at pp. 64-66 & fn. 12, 68.) In this regard, courts must distinguish between ordinary oversight of the subsidiary and control of its facility's operations. (*Id*. at p. 71.) Actions consistent with an ordinary investor status, such as the monitoring of performance, supervision of finances, or the articulation of general policies are not sufficient. (*Id*. at p. 72.) Under one of the more unusual standards to apply, the degree and detail of the control of the facility must be "eccentric" under the norms of parent control of a subsidiary. (*Ibid*.) The focus is on activities "*specifically related to pollution*, that is, operations having to with the *leakage or disposal of hazardous waste*." (*Id*. at pp. 66-67, italics added.)

Water Board contends the trial court erred in narrowing its focus to evidence of eccentric control of category six activities under *Bestfoods*. We agree.[4] This disregards the highlighted language in the above quote and undermines the purpose of statutory efforts to remediate hazardous waste: If a parent corporation had its fingerprints all over the activities of a facility that resulted in the spewing of hazardous waste, it does not make sense to insulate it from liability because it eschewed the direction of any efforts the subsidiary might have made otherwise to dispose of hazardous waste. Otherwise, the disjunctive use of leakage *or* disposal becomes nugatory. "Leakage" bespeaks results that are *not* intended, in contrast with disposal.

---

[4] As we agree that the trial court misinterpreted *Bestfoods*, we do not need to consider the alternative argument of the Water Board that eccentric control of actions that *result* in leakage is required under California law concepts of public nuisance, or ARCO's claim that forfeiture precludes the Water Board from raising this issue on appeal. However, we note that if the Water Board believes that the *Bestfoods* definition of the *type* of activities giving rise to liability is indeed inconsistent with California law, it should not stipulate on remand to applying the *Bestfoods* definition.

A recent Court of Appeals case makes this patently clear in connection with a pollution statute with language that parallels that interpreted in *Bestfoods*. (*United States v. Nature's Way Marine, L.L.C.* (5th Cir. 2018) 904 F.3d 416, 420.) The corporation had control over the navigation of a barge that crashed into a bridge and spilled oil into the river. "Nature's Way directed precisely the activity *that caused the pollution*—it literally was the party that crashed the barge into the bridge." (*Id*. at p. 421, italics added.) This liability was *not* premised on eccentric control over either compliance with regulations for hazardous waste or its disposal; it was control over the activity *resulting in pollution*. And *Litgo New Jersey, Inc. v. Commissioner New Jersey Dept. of Environmental Protection* (3d Cir. 2013) 725 F.3d 369, 382, noted that a "plaintiff need only show that the party engaged in operations *related to* pollution and that a 'release' of hazardous substances occurred, a requirement that can be met by showing that there was a passive migration of waste." (Italics added; cited with approval in *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 377, noting all that is necessary is involvement in operations *having to do with* leakage or disposal of hazardous waste.)

In limiting its consideration of evidence of eccentric control to category six mining activities, the trial court evaluated four cases: *United States v. Kayser-Roth Corp.* (1st Cir. 2001) 272 F.3d 89 (*Kayser-Roth*), *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat* (7th Cir. 1999) 195 F.3d 953 (*Browning-Ferris*), *Basic Management, Inc. v. United States* (D. Nev. 2008) 569 F.Supp.2d 1106 (*Basic Management*), and *Schiavone v. Pearce* (D. Conn. 1999) 77 F.Supp.2d 284 (*Schiavone*). These cases do not support its conclusion.

In *Kayser-Roth*, the trial court found that the parent company essentially made *all* of the operational decisions for the subsidiary through agents who did not even have official positions at the subsidiary, including the selection of the pollution-generating

process and any interaction with governmental agencies on environmental matters. (*Kayser-Roth*, *supra*, 272 F.3d at pp. 102-103.) The parent's agent "played a central role in decisions about environmental compliance . . . and specifically the decision to implement the [polluting] cleaning process [for the mill's fabrics]." (*Id.* at p. 104.) This was sufficient under the *Bestfoods* standard for direct control over operations having to do with leakage or disposal of hazardous waste. (*Ibid.*) The decision does *not* sever the control of pollution-generating activities from control over waste disposal. Its analysis is premised on its interpretation that "pollution-*related* focus is controlling" (italics added), citing cases that find liability *either* for waste disposal or pollution control (*id.* at p. 102), and agreeing with the trial court that it was the parent's *control* of the facility's choice to *use* the polluting agent that subjected it to liability for remediation. (*Id.* at p. 103.)

*Browning-Ferris* is not a particularly instructive decision, as it involves a landfill and thus *any* of the operations necessarily implicate choices that can have environmental consequences, so an analytic distinction between operations in general and waste disposal is not present. (*Browning-Ferris*, *supra*, 195 F.3d at p. 954.) However, Judge Posner noted in general that had the defendant "merely direct[ed] the general operations of [his corporations] . . . *or specific operations unrelated to pollution*," (italics added) that would not be sufficient for his personal liability, but he instead "supervised the day[-]to-day operations of the landfill . . . designing or directing measures for *preventing toxic substances in the wastes from leeching into the ground*." (*Id.* at p. 956, italics added.) Ultimately, the matter required remand because the trial court did not apply this standard in its analysis of the defendant's liability. (*Ibid.*) As a result, this case is not authority for insulating the ARCO predecessors for the pollution consequences of general mining activities that they may have controlled.

*Basic Management* has the fortuity of involving an ARCO predecessor. "Due to problems with Basic Magnesium's management of the facility . . . Anaconda . . . [was

recruited] to take[ ]over Basic Magnesium and its construction and operation of the facility." (*Basic Management, supra*, 569 F.Supp.2d at pp. 1110-1111.) "Anaconda's involvement in building, engineering design, and daily operations of the facility, *and* [its] involvement in the design and funding of waste management and disposal systems" were "sufficient[ly] . . . beyond the norms of parental supervision to establish that Anaconda was an operator of the facility, thereby rendering [ARCO] directly liable." (*Id*. at p. 1116, italics added.) The case did *not* distinguish in its analysis between the control of overall operations that resulted in hazardous waste and the conscious management of hazardous waste.

The factual complexities of *Schiavone* are fortunately beyond the scope of our focus. What *is* pertinent is the conclusion that there was a complete absence of *any* evidence of eccentric control over the operations of the subsidiary. "What is in dispute is whether this involvement . . . reflects an exercise of control by [the parent] sufficient to render it directly liable *for the environmental harm caused*." (*Schiavone, supra*, 77 F.Supp.2d at p. 290, italics added.) On summary judgment, the trial court concluded that the relationship was only oversight typical of a parent corporation: "Th[e] evidence is insufficient to establish that [the parent] managed . . . operations specifically related to the pollution at the . . . plant, *or had anything to do with the leakage or disposal of creosote*." (*Id*. at p. 291, italics added.) Once again, the case is not authority for drawing a division between eccentric control of operations that result in the discharge of hazardous waste and the conscious management of hazardous waste.

ARCO cites additional authority in support of the trial court's interpretation of *Bestfoods*. However, *Trinity Industries, Inc. v. Greenlease Holding Company* (3d Cir. 2018) 903 F.3d 333 states that direct liability arises from the general " 'participation in the activities of the' " polluting facility to an eccentric degree. (*Id*. at p. 363.) Because the evidence showed the subsidiary's employees were responsible for waste disposal *and*

9

the underlying waste-generating activities, the parent corporation was not liable. (*Id*. at p. 364.) The case does not single out waste disposal as the sine qua non for liability. As for *Redevelopment Agency of the City of Stockton v. BNSF Railway Company* (9th Cir. 2011) 643 F.3d 668, it applies the California law of public nuisance under statutory law that ARCO itself otherwise contends does not apply to this appeal (fns. 3 and 4, *ante*) and therefore does not concern us, as it is focused on whether the defendant "created or assisted in the creation of the nuisance on the Property by installing and maintaining the [F]rench drain" or "acted unreasonably as possessors of the Property in failing to discover and abate the nuisance." (*BNSF Railway, supra*, at pp. 671, 673.) Finally, the purpose of alluding to *Control Data Corp v. S.C.S.C. Corp.* (8th Cir. 1995) 53 F.3d 930 eludes us. Not only does the case antedate *Bestfoods*, it asserts as a broad proposition that a responsible party is one that "*releases* hazardous materials into the environment" (*id.* at p. 936, italics added) without further elaboration on the *type* of activity having that result, and found that the defendant was an operator of the facility that "released" pollution (without specifying the manner), with "authority over . . . delivery, storage, handling, and transportation of dry-cleaning chemicals." (*Id*. at pp. 933, 937.)

In short, we do not find any basis for the trial court's limitation of *Bestfoods* to eccentric control over the *disposal* of waste, as opposed to eccentric control over the *general* operations of a facility that result in the generation of toxic waste. Neither party contends that the evidence of whether the ARCO predecessors exercised eccentric control over the operations of the Walker Mine is undisputed such that we could resolve the question as a matter of law, and ARCO disputes the Water Board's finding that its predecessors actively engaged independently in mining at the Walker site. We are therefore compelled to remand the matter to the trial court for it to make a determination of ARCO's liability under the proper standard of eccentric control over *any* category of

10

mining activity resulting in toxic discharge, including the Water Board's claim that the activity itself of disturbing the rock strata can generate toxic waste.

## DISPOSITION

The judgment is reversed and the matter remanded for reconsideration of the record in light of the proper legal standard explained in this opinion. The Water Board shall recover costs of appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/S/

_____

BUTZ, Acting P. J.


We concur:

/S/

_____

DUARTE, J.

/S/

_____

RENNER, J.

11

Filed 10/15/19

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ATLANTIC RICHFIELD COMPANY, | C086745 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201480001875CUWMGDS) |
| v. | |
| CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD, | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Reversed with directions.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor and Russell B. Hildreth, Deputy Attorneys General, for Defendant and Appellant.

Farella Braun + Martel, James H. Colopy, Caroline E. Lee, Russell E. Taylor; Davis Graham & Stubbs and Benjamin B. Strawn for Plaintiff and Respondent.

1

THE COURT:

It is ordered that the opinion filed herein on September 13, 2019, be modified as follows:

On page 1, the second sentence referencing the "Central Valley Regional Water Quality Control District" the word "District" should be replaced with the word "Board."

This modification does not change the judgment.

The opinion in the above-entitled matter was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

FOR THE COURT:


 /s/
Butz, Acting P.J.



 /s/
Duarte, J.



 /s/
Renner, J.

2